918 So.2d 181 (2005)
Lamar Z. BROOKS, Appellant,
v.
STATE of Florida, Appellee.
No. SC02-538.
Supreme Court of Florida.
June 23, 2005.
Rehearing Denied December 22, 2005.
*186 Nancy A. Daniels, Public Defender and David A. Davis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Charles J. Crist, Jr., Attorney General and Charmaine M. Millsaps, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment of conviction of two counts of first-degree murder and corresponding sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated herein, we affirm the convictions of Lamar Z. Brooks and his sentences of death.

FACTS AND PROCEDURAL HISTORY
This is the second appearance of Brooks before this Court on appeal of his convictions and sentences of death for the first-degree murders of Rachel Carlson and her infant daughter, Alexis Stuart. On April 5, 2001, this Court reversed Brooks' initial convictions and sentences for the murders based on the "erroneous admission of extensive hearsay testimony," and remanded the case for a retrial. See Brooks v. State, 787 So.2d 765, 768 (Fla.2001) (hereinafter "Brooks I"). The decision in Brooks I set forth the facts giving rise to the charges filed in the instant case as follows:
In the late night hours of April 24, 1996, Rachel Carlson and her three-month-old daughter, Alexis Stuart, were found stabbed to death in Carlson's running vehicle in Crestview, Florida. Carlson's paramour, Walker Davis, and Brooks were charged with the murders. *187 Davis was married and had two children, and his wife was pregnant with their third child. However, the victim believed Davis was also the father of her child and demanded support from him. [n.1] Davis became concerned about this pressure. He was convicted of the murders and sentenced to life imprisonment. However, he did not testify at Brooks' trial.
[n.1.] DNA tests performed after the murders revealed that Davis was not the father.
Brooks lived in Pennsylvania but had traveled to Florida from Atlanta with his cousin Davis and several friends on Sunday, April 21, 1996. Brooks stayed with Davis at Eglin Air Force Base for a few days before returning to Pennsylvania. In interviews with the police, he informed them that on the following Wednesday evening, the night of the murders, he helped Davis set up a waterbed, watched some movies, and walked Davis's dog.
Contrary to Brooks' statements, several witnesses placed him and Davis in Crestview on the night of the murders, although no physical or direct evidence linked him to the crimes.
Brooks I, 787 So.2d at 768-69.
Upon retrial, Brooks was again convicted and sentenced to death. The jury recommended the death sentence by a nine-to-three vote for the murder of Carlson, and an eleven-to-one vote for the murder of Stuart. The trial court followed the recommendations, finding the following factors in aggravation for the murders of both Carlson and Stuart:[1] (i) the previous conviction of another capital felony; (ii) the commission of a capital felony in a cold, calculated, and premeditated manner (CCP); (iii) the commission of a capital felony for pecuniary gain; and (iv) that the murder occurred during the commission of the felony of aggravated child abuse. The trial court also found that Carlson's murder was especially heinous, atrocious, or cruel (HAC). Despite Brooks' waiver of the right to present mitigating evidence, defense counsel described to the trial court the mitigating evidence he would have presented, and the trial court found several factors in mitigation.[2]
Brooks has appealed his convictions and sentences, raising fourteen issues. These claims are discussed further herein.

LIFE INSURANCE POLICY
Under Florida law, all relevant evidence, defined as that tending to prove or disprove a material fact, is admissible unless otherwise provided by law. See *188 §§ 90.401, .402, Fla. Stat. (2002). Relevant evidence is inadmissible, however, where the probative value is substantially outweighed by the danger of unfair prejudice. See § 90.403, Fla. Stat. (2002). The admissibility of evidence is within the sound discretion of the trial court, and the trial court's determination will not be disturbed on appellate review absent a clear abuse of that discretion. See, e.g., Ray v. State, 755 So.2d 604, 610 (Fla.2000); Zack v. State, 753 So.2d 9, 25 (Fla.2000).
In Brooks' retrial, the trial court permitted, over defense counsel's objection, insurance salesman Steve Mantheny to testify regarding only the existence of a $100,000 life insurance policy purchased by Davis in February 1996, which named the minor Stuart child as the insured and Davis as the primary beneficiary. The trial court admitted the policy for the limited purpose of establishing the source of the $10,000 which the State's witness, Mark Gilliam, testified Davis had promised to pay Brooks to murder Carlson. The trial court expressly excluded the policy as evidence of Brooks' motive for murder. On appeal, Brooks contends that the trial court committed the same error as this Court found during the initial review by admitting evidence beyond the parameters of the conspiracy to prove Brooks' motive and intent. Brooks notes that the State ignored the trial court's evidentiary ruling by repeatedly arguing and using the insurance policy as evidence of motive for both Davis and Brooks.
We hold that the trial court did not abuse its discretion in admitting evidence concerning the existence of a $100,000 life insurance policy for the purpose of establishing the source of the funds promised to Brooks for his role in killing Rachel Carlson and Alexis Stuart. At trial, the State established the existence of a conspiracy to kill the victims through the testimony of Mark Gilliam, a fellow member of the military and a friend of Brooks, who accompanied Brooks and Davis to Eglin Air Force Base on April 21, 1996. Gilliam testified that in the early evening hours of Monday, April 22, 1996, Davis expressed his desire to murder a woman who had been pestering him for money. According to Gilliam, the conversation proceeded with the three men each suggesting the best way to murder the woman. Gilliam stated that although he initially thought the discussion was in jest, a murder plan developed pursuant to which Davis would lure the woman, Carlson, to his apartment to pick him up, and Gilliam and Brooks would then follow behind in Gilliam's vehicle to a predesignated place in Crestview, at which time Brooks would exit the car and shoot the victim, Carlson. Gilliam testified that the three attempted to actually execute the plan that evening and the following evening, but that each attempt ended in failure.[3]
According to Gilliam, Brooks and Davis had each promised to pay him $500 for his role in the execution to act as the driver for the plot. Gilliam also testified that Davis had promised to pay Brooks $10,000 to kill Carlson. This is direct evidence of the plot to murder and the nexus to a large sum of money. The source of payment was connected to the existence of the life insurance policy.
Evidence regarding the payment of these relatively large sums of money was coupled with testimony demonstrating that Davis and Brooks were of limited financial means. Davis's coworker, Paul Keown, *189 testified that Davis worked in the hospital laboratory at Eglin Air Force base, a position that presumably did not garner a large salary. Friends of Davis testified that, at the time of the crime, he was married with two children and a third on the way. Gilliam testified that neither Brooks nor Davis had access to a car at the time of the murders, and that Davis did not have a telephone at his house. Gilliam also expressed doubt that either Brooks or Davis had the $500 that each had promised to pay him for driving the car. Through the testimony of Thomas Hardin, a fellow airman and friend of Davis, the jury learned that Brooks had to receive a $244 wire transfer of the funds he needed to purchase an airline ticket to return from Florida to Philadelphia. On the basis of the evidentiary record, the trial court reasonably concluded that the insurance policy was relevant to establish the source of the money Davis promised to pay Brooks for his part in the crimes. See Dyas v. State, 260 Ark. 303, 539 S.W.2d 251, 261 (1976) (deeming testimony regarding life insurance policies relevant to motive underlying conspiracy and murder because it supported the connection between the policies and the co-conspirator wife's ability to pay the killers a far greater amount than the contract stipulated for her husband's murder).
Moreover, we resolve that it would not have constituted error for the trial court to admit the life insurance policy as evidence of Brooks' motive and intent. To the contrary, the source of funding to be utilized to pay Brooks and Brooks' motive are inextricably intertwined.[4] Given that Davis was a low-ranking member of the military, with a wife and growing family to support, without even access to an automobile, and no telephone in his home, it strains credulity to conclude that Brooks and Davis would not have considered the source from which Davis planned to obtain the $10,000. Indeed, Brooks would have been even more familiar with the precarious state of his cousin's finances than Gilliam, who was a stranger to Davis, but nonetheless testified that neither man appeared to have the $500 to pay him to drive the car. Also, Brooks acknowledged in his statements that he was aware of Alexis Stuart, and that his cousin had denied paternity of the baby. This evidence amply supports the inference that the insurance proceeds in the plan of Davis and Brooks were essential to the plot and the insurance policy on the infant's life was inextricably intertwined with the conspiracy. On the basis of this record, it would have been permissible to introduce the insurance policy as evidence of Davis's intent and ability to pay Brooks to complete the conspiracy to commit the murders and Brooks' motive and intent to fulfill his commitment to the conspiracy and complete the act.
We recognize that permitting a life insurance policy to be placed into evidence without a proper foundation may result in undue prejudice. For that reason, based on the facts presented in the instant matter, we endorse the rule employed by the Georgia state courts, which requires a nexus between the crime charged and the life insurance policy. See Stoudemire v. State, 261 Ga. 49, 401 S.E.2d 482, 484 (1991) ("[I]n order to admit evidence of an insurance policy there must be some independent *190 evidence of a nexus between the crime charged and the existence of the insurance policy."); see also Givens v. State, 273 Ga. 818, 546 S.E.2d 509, 513 (2001).[5] In the instant case, we determine that evidence establishing the substantial sum of money Davis promised to pay Brooks to complete the conspiracy to commit murder coupled with evidence of the modest financial means of Davis  a condition that would not have escaped his cousin's notice under these circumstances  more than satisfies this nexus requirement. Accordingly, Steve Mantheny's limited testimony establishing that Davis had procured a policy on Alexis Stuart's life was properly admitted.
We decline to require direct evidence establishing beyond a reasonable doubt that Brooks knew about the existence of the life insurance policy. We recognize that some state courts have conditioned the admissibility of life insurance policies on the defendants' knowledge. Most notably, in People v. Mitchell, 105 Ill.2d 1, 85 Ill.Dec. 465, 473 N.E.2d 1270 (1984), the Illinois Supreme Court reaffirmed its rule that "admission of evidence of a life insurance policy must be predicated upon evidence of the defendant's knowledge of its existence, its validity, or believed validity, and that he will benefit therefrom." Id. at 1274 (citing People v. Gougas, 410 Ill. 235, 102 N.E.2d 152 (1951)). The reasoning that compelled the outcome in People v. Mitchell does not, however, apply with equal force in the instant matter.
People v. Mitchell involved a mother's alleged aggravated battery and attempted murder of her seventeen-month-old daughter. Attempted murder is a specific intent crime, and the court noted that the only evidence of intent introduced by the prosecution was a $10,000 life insurance policy on the baby's life and the defendant's own statements, which established that she had intended to strike her child but not that she intended to kill her. See id. at 1274. Indeed, the court specifically determined that the defendant's actions of placing a cool compress on the child's forehead and taking her to the emergency room for medical attention were inconsistent with an intent to commit murder. See id. On this basis, the court determined that the trial court had erred in admitting evidence of the life insurance policy where the state had failed to prove that the policy was in force at the time of the offense or that the policy played a role in the defendant's actions. See id. at 1275.
In contrast to the scenario in People v. Mitchell, the life insurance policy admitted here did not fill a vacuum in the evidentiary record on a necessary element of proof. Direct, corroborated evidence conclusively established a plan to murder Rachel Carlson. Direct, corroborated evidence also established that Davis did not have the $10,000 he promised to pay Brooks to complete the plan. The direct and logical inference that arises from this evidence is that Brooks knew that his cousin would be forced to tap into some substantial source to pay him the $10,000. While such evidence stops short of substantiating that Brooks knew of the exact insurance policy, or all the facts surrounding it, it more than amply supports the admission of the policy as evidence of the motive possessed by *191 Brooks to murder both Carlson and Stuart.
The partially dissenting opinion of Chief Justice Pariente cites to a number of other cases in which courts have held that the defendant's knowledge of a life insurance policy must be laid as a predicate to its admission. These cases are factually distinguishable and do not control the analysis in the instant matter. In most of the cases cited by the dissent, the defendant was the beneficiary under the deceased's life insurance policy. Under such a scenario, it is only logical to require evidence establishing that the defendant knew of the policy in support of admitting it as evidence of motive. Such a principle does not govern here, where Brooks' motive, in pertinent part, was to collect $10,000  a sum that would have been impossible for Davis to marshal in the absence of a large payout from a source such as an insurance policy. Thus, the policy is relevant and highly probative to Brooks' motive and can be logically and properly established through the inference that Davis informed Brooks of the policy to prove the bona fides of his promise to pay.[6] Even the few conspiracy cases cited by the dissent are likewise distinguishable on the basis that the source of the money for Brooks' payment was at issue in the instant matter.
Moreover, contrary to Brooks' contention, Brooks I does not preclude as irrelevant any evidence of Davis's motive arising outside the time frame of the conspiracy. Evidence of one coconspirator's motive can indeed illuminate the motive of others. In Strickland v. State, 122 Fla. 384, 165 So. 289 (1936), this Court reviewed the second-degree murder conviction of Coy Strickland who had been hired by Jim McCall to kill the victim, Tom Spear. See id. at 290. Strickland raised four claims of error, the first of which asked this Court to consider whether "[i]n a separate trial of a defendant whose motive for killing the decedent the state purported to prove, is evidence admissible to show the distinct or separate motive of an accomplice not on trial?" Id. at 289. In answering in the affirmative, we stated:
A material fact to the issue in this case was motive, not only motive of the accused which was shown to be that of pecuniary gain, but also in establishing the fact that McCall was the actor in hiring the accused to commit the act which caused the death of Spear it was material to show that there was a motive for McCall to hire Strickland to perform that act. The motive which actuated McCall was material because that motive would show, or tend to show, a reason why he would be willing to pay Strickland to commit the murder.
Id. at 290.
Applying the principle established in Strickland to the instant case, it follows that the insurance policy provided Davis a motive to be part of the plot to kill Alexis Stuart, and the source of the proceeds for the payment to Brooks of $10,000 to murder both the baby and her mother. The $10,000, which the cash-strapped Davis would have been unable to pay but for the insurance proceeds, in turn, provided Brooks with the motive of pecuniary gain to commit the crimes. Ultimately, the admonition articulated in Brooks I, that it was improper to use the statements made by Davis outside the scope of the conspiracy to impute motive to Brooks, cannot be severed from the facts of that case, which *192 involved the admission of numerous hearsay statements allegedly made by Davis that were pertinent only to Davis's motive and intent.[7] In Brooks I, this Court did not address evidence, such as the insurance policy itself, that is both highly probative and relevant to the motive of both Davis and Brooks.[8]

ADMISSIBILITY OF BILLIE MADERO'S TESTIMONY
The trial court admitted, over defense counsel objection, the testimony of Billie Madero, an employee of the Department of Revenue, who testified that she documented a call received from an individual who had identified herself as Rachel Carlson and requested that a case be opened against Walker Davis, Jr., for child support. The information obtained from Carlson during the telephone conversation was recorded on a template sheet of paper containing standard questions to provide the Department of Revenue identical information from every caller. The State attempted to introduce Madero's summary of the phone conversation under the business record exception to the hearsay rule.
Brooks mounts two challenges to the child support claim record. First, Brooks argues that the record was totally irrelevant with regard to his motive because there was no evidence demonstrating that he even knew of the record. Brooks also asserts that the State failed to establish a proper foundation showing that it was indeed Carlson who placed the call. The State counters that the record was probative of motive for both Davis and Brooks because it illuminated why Davis hired Brooks  namely to kill Carlson and Stuart to avoid child support obligations. We conclude that the trial court abused its discretion in admitting the record.
As previously indicated, the State advanced at trial the theory that Brooks was motivated to kill, at least in part, by the desire to aid his cousin in evading child support payments. There is very little record evidence, however, demonstrating that either Davis or Brooks was aware of Carlson's desire to obtain child support or any steps taken by Carlson to actually obtain such support. The summary record of the telephone conversation testified to by Madero was not a complaint for child support that Davis would have been served with or would have received a copy of. Davis's knowledge of Carlson's support request rests on the sole asserted inference that Carlson would not have paid the $25 fee charged to open a child support case at the Department of Revenue without first seeking a negotiated settlement with Davis, coupled with testimony from Davis's *193 neighbors and Gilliam that Carlson was seen at Davis's apartment in the days shortly before the murders crying and agitated.
Brooks did admit in a police statement that he knew of Stuart's existence and that his cousin had denied paternity of the child. There is no direct evidence, however, that Carlson had demanded child support payments from Davis. To the contrary, Mark Gilliam testified that during the initial stages of his participation in the conspiracy, Davis had only informed Gilliam that he intended to kill the woman who had been pestering him for money for a stereo. No mention was made of child support payments. Without evidence showing that Davis or Brooks knew of Carlson's support request, the Department of Revenue record is irrelevant to anyone's intent and motive.
The admission of Madero's testimony violates the proscription against hearsay evidence. To be admissible as a business record, it must be shown that the record was (1) made at or near the time of the event recorded; (2) by or from information transmitted by a person with knowledge; (3) kept in the course of a regularly conducted business activity; and (4) that it was the regular practice of that business to make such a record. See Quinn v. State, 662 So.2d 947, 953 (Fla. 5th DCA 1995); § 90.803(6)(a), Fla. Stat. (2002). To the extent the individual making the record does not have personal knowledge of the information contained therein, the second prong of the predicate requires the information to have been supplied by an individual who does have personal knowledge of the information and who was acting in the course of a regularly conducted business activity. See Quinn, 662 So.2d at 953; Van Zant v. State, 372 So.2d 502, 503 (Fla. 1st DCA 1979). If this predicate is not satisfied, then the information contained in the record is inadmissible hearsay, unless it falls within another exception to the hearsay rule. See Quinn, 662 So.2d at 953-54; see also Hill v. State, 549 So.2d 179, 181 (Fla.1989); Johnson v. Dep't of Health & Rehabilitative Servs., 546 So.2d 741, 743 (Fla. 1st DCA 1989); Harris v. Game & Fresh Water Fish Comm'n, 495 So.2d 806, 809 (Fla. 1st DCA 1986) ("The general rule is that a hearsay statement which includes another hearsay statement is admissible only when both statements conform to the requirements of a hearsay exception."); Van Zant, 372 So.2d at 503.
The business record exception does not permit the admission into evidence of the hearsay statements within the Department of Revenue record. The information in the record regarding the alleged relationships between Carlson, Stuart, and Davis was not within Madero's personal knowledge, but was supplied by Rachel Carlson, who, obviously, was not acting within the course of a regularly conducted business activity. The scenario is similar to that recently faced by the Fifth District in Reichenberg v. Davis, 846 So.2d 1233 (Fla. 5th DCA 2003), in which the district court determined that the information contained within the records of the Department of Children and Families pertaining to the alleged sexual abuse of a seven-year-old boy was not admissible under the business records exception because it was relayed by witnesses, and not "based upon the personal knowledge of an agent of the `business.'" Id. at 1234; see also Van Zant, 372 So.2d at 503 (determining that the business record exception did not extend to the information contained within a probable cause affidavit and sworn complaint because the source of the information contained within the record was the victim, not the person who prepared the record). Without an alternative exception *194 to cover the hearsay contained in the Department of Revenue record developed from a telephone call, the substance of the record should not have been admitted into evidence here. See Hill, 549 So.2d at 181.
We thus conclude that the trial court erred in admitting Madero's testimony regarding the substance of the Department of Revenue record. The impact of the trial court's error in admitting this evidence is subject to evaluation under a harmless error analysis as set forth in State v. DiGuilio, 491 So.2d 1129 (Fla.1986). There, this Court held:
The harmless error test ... places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction. Application of the test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict.
Id. at 1135 (citation omitted).
Applying the DiGuilio standard, we determine that the State has established beyond a reasonable doubt that the admission of the limited record information did not contribute to the verdict in the instant case. To the extent Brooks' motive and intent were issues at trial, the State established Brooks' motive of pecuniary gain with Gilliam's testimony that Davis promised Brooks $10,000 to commit murder, coupled with the evidence that Davis was a man of modest means who had procured a $100,000 insurance policy on the life of Alexis Stuart. There is no reasonable possibility that the error in admitting the limited Department of Revenue record, which could have only served to provide an alternative theory of Brooks' motive, contributed to Brooks' conviction.
There is an overwhelming amount of properly admitted evidence upon which the jury could have legitimately relied in finding Brooks guilty in the instant matter. Importantly, during this trial, Mark Gilliam related detailed, substantiated information regarding the two failed attempts he, Brooks, and Davis had made on Carlson's life. Gilliam testified that on Monday, April 22, 1996, Davis phoned Carlson from the hospital asking her to meet him at his home where Gilliam and Brooks were secretly waiting in Gilliam's car. According to Gilliam, he and Brooks followed the vehicle occupied by Davis and Carlson in the direction of the predesignated place in Crestview where, according to plan, Brooks was to shoot Carlson. Gilliam established that Brooks had a pistol-grip shotgun and latex gloves with him in the car. Gilliam's version of events was partially corroborated by the testimony of a law enforcement officer who performed a consensual search of Davis's home after the murders and discovered a short-handled shotgun. In addition, the crime scene analyst testified that the smudged hand impressions found at the crime scene were consistent with the perpetrator wearing latex gloves.
Gilliam further testified that during the course of the duo following Carlson's car on the night of the first failed murder attempt, Carlson was stopped by a law enforcement officer for speeding. Gilliam explained that he drove by Carlson's stopped car, made two u-turns, and pulled up a short distance behind her. This testimony was partially corroborated by that of Florida State Trooper Michael Hulion, who reported that he stopped Carlson for *195 speeding on Monday, April 22, and noted the presence of a baby in the back seat as well as a black male in the passenger seat. Gilliam further described that as this was occurring a second police officer drove to a position behind his vehicle, approached his car, and began questioning the two men as to why they had positioned their vehicle behind Carlson's stopped vehicle. Testimony at trial confirmed that a sheriff's deputy had in fact run a check on Gilliam's license plates that evening in the vicinity of Crestview.
Gilliam also described in detail the second attempt to effectuate the murder, which occurred on the following day, Tuesday, April 23, and followed largely the same sequence of events with Carlson picking Davis up at a local shopping center and Gilliam and Brooks following behind. According to Gilliam, the second attempt ended in failure because Gilliam became separated from Carlson's car at a stop light. Gilliam stated that he and Brooks proceeded to the predesignated location in Crestview and waited for the plan to unfold, but Davis and Carlson did not appear. Gilliam's testimony was supported by the testimony of the officers who questioned Gilliam after the murders and related that he placed "Xs" on a map of Crestview that corresponded to the area in which the victims' bodies were found. Finally, Gilliam stated that he backed out of the murder plan and left Eglin the morning of April 24 to return to his base at Fort Benning, Georgia. Gilliam testified that prior to his departure, Davis helped him secure false hospitalization documents to explain his delayed return to his base.
Gilliam's testimony regarding the failed attempts to proceed with the murder provides compelling and persuasive evidence of Brooks' involvement in the murders of Rachel Carlson and Alexis Stuart. This testimony was not presented during Brooks' initial trial. In light of the totality of the evidence, there is no reasonable possibility that the admission of the limited child support record information could have contributed to the jury verdict. See DiGuilio, 491 So.2d at 1135.
Gilliam's testimony is not, however, the only evidence supporting Brooks' conviction. Record evidence also firmly establishes Brooks' presence in Crestview in the vicinity of the crime scene in close proximity to the time of the murders. Witnesses Irving Westbrook and Charles Tucker testified that they saw two men walking in the vicinity of the murder scene, away from where Carlson's car was later found, around the time of the murder. According to Irving Westbrook, one of the men had a limp. Their testimony was corroborated by witness Kea Bess who had previously been introduced to Davis by a mutual friend on the Sunday prior to the murders. Bess testified that she saw Davis, whom she recognized because of the cast on his leg, and another man walking rapidly in the opposite direction from the crime scene. According to Bess, one of the men was carrying a bag.
Witness Michelle Thomas testified that Davis and Brooks visited her Crestview apartment, located only a few blocks from the scene of the crime,[9] on the night of the murders shortly after 9 p.m. She stated that both men were wearing black nylon pants and that Brooks carried a black backpack. Thomas testified that Brooks used the bathroom, Davis asked for a towel, and both men used the telephone.[10] *196 The presence of Brooks and Davis in Thomas's apartment that evening was also corroborated by the testimony of Nikki Henry, a friend of Thomas, who arrived just as the two men were walking away from the location.
The presence of Brooks and Davis in Crestview on the night of the murders was further established and verified by the testimony of Rochelle Jones. Jones stated that she received a call from Davis on the night of the murders requesting that she come to a particular location to provide transportation for the duo. Davis gave Jones directions to drive to a street in Crestview between a credit union and an animal hospital.[11] Jones's testimony was corroborated by telephone records, and the testimony of a police officer who stopped Jones for speeding as she drove back to Eglin Air Force base, who noted the presence of two black males in her vehicle and requested that Davis assume operation of the vehicle because Jones was operating the vehicle with a suspended license. The testimony of Jones was further corroborated by that of Glenese Rushing, who was using the automatic teller machine at the Crestview credit union on the night of the murders and reported seeing two people across the street at the animal hospital entering a car that subsequently made a u-turn in the credit union parking lot.[12] The testimony of Jones also establishes that whatever transportation Brooks and Davis may have used to travel to Crestview that evening was apparently unavailable for the return trip.
Record evidence also demonstrates the guilty knowledge of Brooks regarding the murders. In contrast to the multitude of witnesses who placed Brooks in Crestview near the crime scene on the night of the murders, Brooks consistently denied being in the community during his police interviews. According to Air Force Office of Special Investigations Agent Karen Garcia, Brooks claimed that he and his cousin remained in Davis's apartment near Eglin Air Force base assembling a waterbed on the night of the murders, leaving only briefly to walk Davis's dog. At one point during his interview with Agent Garcia, Brooks stated, "Walker is on his own. If he did something, he's on his own." The investigator from the office of the State Attorney, Michael Hollinhead, also interviewed Brooks shortly after the murders. Hollinhead testified that when he attempted to develop information from Brooks regarding the person named "Mark" (subsequently identified as Gilliam), who had accompanied Brooks to Davis's home on April 21, Brooks became "evasive."
The identity of Brooks as the individual who killed Carlson and Stuart is also supported by substantial evidence. Forensic evidence established that both Carlson and Stuart were killed by a person seated in the rear driver's-seat of the vehicle,[13] and *197 that no one occupied the front passenger's seat at the time of Carlson's stabbing.[14] Other evidence demonstrated that Brooks was the individual seated in the back seat of Carlson's vehicle. Importantly, Davis was in a leg cast at the time of the murder. That fact renders it highly unlikely that Davis would have been able to sit in the back seat of a car in a position that would have left him able to muster the leverage utilized to mount this attack from behind. Moreover, a shoe print was found on Carlson's shoulder. A forensic expert opined that the print was consistent with the killer extricating himself from the vehicle by climbing over the victim's body, which was found in the front seat, or opening the driver's-side front door and kicking Carlson over. Either feat would have been almost impossible for a man in a leg cast. Moreover, Davis sat in the front passenger seat during the prior failed murder attempts as established by the trooper who stopped Carlson for speeding and testified to seeing a baby in the back seat and a black man in the right front seat.
On the basis of this record, there is no reasonable possibility that the erroneous admission of the limited testimony of Madero regarding the child support record contributed to Brooks' conviction. As detailed above, the State introduced extensive, substantial, direct, and corroborated testimony regarding the plan to murder Rachel Carlson and the role of Brooks as killer. The jury also heard a significant amount of direct testimony and other evidence which placed Brooks in the vicinity of the crime scene on the night of the murders without transportation back to Eglin. The forensic evidence demonstrated that the victims were killed by someone occupying the back seat of Carlson's car, and that no one occupied the passenger seat at the time of the murders. The only reasonable inference to draw from the forensic evidence, coupled with the direct testimony concerning the role of Brooks as the killer, and the fact that Davis was in a leg cast at the time of the murders, is that it was Brooks who inflicted the fatal blows. The State clearly established the motive of pecuniary gain and the guilty knowledge attributable to Brooks through the content of his police statements. All of this evidence was properly admitted before the jury to be utilized by the jury in reaching its verdict. For these reasons, we conclude that the trial court's error in admitting the limited testimony of Madero and the Department of Revenue record was harmless beyond a reasonable doubt.

AGGRAVATED CHILD ABUSE
Brooks argues on appeal that the trial court erred by finding that he committed the murders during the course of a felony, which was aggravated child abuse as defined by statute, and then applying the aggravated child abuse aggravating circumstance set forth in section 921.141(5)(d), Florida Statutes (2002), during sentencing. He contends that because the single act of stabbing Stuart formed the basis of both the aggravated child abuse aggravating factor under section 921.141(5)(d) of the Florida Statutes and the first-degree felony murder charge, the court should have found that the aggravated child abuse allegation "merged" with the more serious homicide charge. Thus, according to Brooks, the State should have been totally precluded from invoking the *198 felony murder doctrine and should have been limited to proving first-degree murder only on the theory of premeditation for both murders. Brooks does not merely attack the use of the underlying felony as an aggravator; he asserts that the state is prohibited from using aggravated child abuse as the felony crime. We agree.
This Court addressed the same claim in Lukehart v. State, 776 So.2d 906 (Fla.2000), where the defendant shook a baby and the baby thereafter died. The defendant in Lukehart argued that there was no felony separate from the homicide. In making this argument, Lukehart relied on Mills v. State, 476 So.2d 172, 177 (Fla.1985), which addressed the issue of whether convictions of first-degree murder and aggravated battery could both stand when arising out of the same act. This Court found in Mills that the two convictions could not stand and vacated the conviction for aggravated battery. While we rejected the analogy to Mills in Lukehart because the facts were distinguishable, Mills is applicable to the instant matter.
In Mills, the defendant broke into a house in the middle of the night intending to steal something. When the homeowner awoke to investigate, the defendant shot and killed him. The defendant was charged with one count of felony murder, one count of burglary while armed with a firearm, and one count of aggravated battery with a firearm. This Court held that while the defendant could be found guilty of all three charges, it was not proper to convict him for aggravated battery and simultaneously for homicide as a result of one shotgun blast. Mills, 476 So.2d. at 177. In that limited context, we concluded that the felonious conduct merged into one criminal act. Id. As we explained in Mills, "We do not believe that the legislature intended dual convictions for both homicide and the lethal act that caused the homicide without causing additional injury to another person or property." Id.
Thus, Mills clearly bars a conviction of aggravated battery where a single act of aggravated battery also causes a homicide. This determination is based on the fact that the aggravated battery has merged into the homicide. Likewise, had Brooks been charged with aggravated child abuse, he could not have been convicted of that crime. That is because aggravated child abuse is an aggravated battery, the only difference being that the victim is a child. See 827.03(2), Fla. Stat. (2002) ("`Aggravated child abuse' occurs when a person: (a) commits aggravated battery on a child...."). In light of the fact that Brooks delivered a single stabbing blow that resulted in Alexis Stuart's death, the act constituting the aggravated child abuse merged into the infant's homicide.
Generally, aggravated child abuse can be a separate charge and serve as the felony in a felony murder charge. This is the situation that occurred in Mapps v. State, 520 So.2d 92 (Fla. 4th DCA 1988), in which the defendant was convicted of felony murder with the underlying felony being aggravated child abuse. In Mapps, the defendant threw, shook, or struck a ten-month old child causing a skull fracture which killed the child. The defendant argued that the aggravated battery "merged" into the homicide and could not constitute a valid basis for a felony murder charge. The Fourth District disagreed and found that the underlying felony need not always be independent of the killing as a prerequisite for a conviction of felony murder. See id. at 93.
Importantly, however, in Mapps, there were separate acts of striking, shaking, or throwing which led to the killing of the child. In contrast, the instant case involved the single act of stabbing which caused a single injury. In a case such as this where *199 the Mills rule prevents a conviction of aggravated battery because a single act caused both an aggravated battery and a homicide, aggravated battery cannot then serve as the underlying felony of the felony murder charge. It makes no difference that Brooks was not charged or convicted of aggravated child abuse because that crime, under these facts, merges with the homicide itself. In the instant matter, the action underlying the aggravated child abuse factor constituted the fatal stab wound that killed Alexis Stuart. Because there is no separate offense of aggravated child abuse, that crime cannot logically serve as the underlying felony in a felony murder charge.
The trial court's error in relying on the aggravated child abuse factor in aggravation has no impact on the sentencing determination for either murder. Had the aggravated child abuse factor not been available, the trial court could have properly applied the aggravator that the victim, Alexis Stuart, was less than twelve years of age, resulting in the loss of no aggravation as it pertains to the murder of Alexis Stuart.[15] While elimination of the aggravated child abuse factor results in the loss of one aggravator as applied to the murder of Rachel Carlson, such a loss would not have impacted the determination of sentence in that matter. Four aggravators continue to apply to the murder of Rachel Carlson, including both HAC and CCP. The aggravating factors continue to substantially outweigh any mitigation, which supports application of the death sentence for Rachel Carlson's murder.

ADDITIONAL ERRORS
We turn now to address three other errors asserted to have been committed by the trial court. The first error we address is the trial court's decision to admit two notes recovered from Davis's leg cast when it was removed shortly after the murders, on May 2, 1996. One piece of paper contained the following two written statements, "What time is the first flight and the name," and "US Air, 545, $244.00, Sgt. Samms." The second note also contained two written statements, the first being, "Mark would have cracked up" and the second stating, "Events, Home to walk Heavy and then to home." In response to defense counsel's objection, the State argued that the notes, written in two different handwriting styles, were relevant to connect the coconspirators through the lies they told law enforcement, to link each of them to the night of the murders, and to show consciousness of guilt. On appeal, the State stresses the fact that the notes capture the lie told by Brooks during his interview with police that he and Davis were at Davis's apartment on the night of the murders setting up a waterbed and left the apartment only for a brief time to walk Davis's dog.[16]
The trial court admitted the notes as additional evidence to show an association between Brooks and Davis from which the jury could determine the existence of a conspiracy and as evidence from which the jury could infer Brooks' consciousness of guilt. Brooks contends on appeal that the trial court abused its discretion in admitting the notes because there is no evidence connecting him to the notes. We agree.
The only person to whom the notes reasonably could be linked was Davis because they were found on his person and bore his *200 fingerprint. The notes were never connected in any form or fashion to Brooks. While the State contends that the notes were jointly authored and constitute a conversation of sorts in which the co-conspirators solidified the lies they would tell police, it offered no evidence that either Davis or Brooks wrote the notes. The State's argument that the lies of Brooks to law enforcement officers tied him to the notes similarly fails to persuade us that they were admissible, because the State offered no evidence as to when the notes were drafted or when they were placed in Davis's cast.
We also find error in the trial court's decision to allow the State to impeach the trial testimony of witness Melissa Thomas with the statement she had previously given police. At trial, Melissa Thomas testified that on the night of the murders, Davis and Brooks came to her Crestview apartment at approximately nine o'clock. In her testimony, she relayed that each man arrived at her apartment clothed in black nylon pants and that Brooks used the bathroom. Thomas further testified that she recalled being interviewed by police shortly after the murders. When the State asked whether she recollected telling Agent Haley during the course of the interview that Brooks came out of the bathroom wearing shorts, Thomas answered, "No, I don't remember."
Subsequently, the State called Agent Haley to testify regarding his interview of Thomas, including the portion in which she stated that Brooks changed into shorts in the bathroom. Defense counsel made multiple objections, including that the impeachment was improper because Thomas's trial testimony did not materially differ from her police statement. The trial judge allowed the impeachment, determining that her trial testimony and previous statement were "contradictory to a degree."
The trial court erred in permitting this impeachment of Thomas's testimony. Florida courts have held that a witness's inability to recall making a prior statement is not synonymous with providing trial testimony that is inconsistent with a prior statement. See James v. State, 765 So.2d 763, 766 (Fla. 1st DCA 2000); Calhoun v. State, 502 So.2d 1364, 1365 (Fla. 2d DCA 1987) (deeming it improper to impeach a witness who testified that she could not recall stating that she had a reputation as an aggressive female police officer with the testimony of another witness who heard her make such a statement). In James, the district court adopted the reasoning employed by the Oregon Court of Appeals in holding:
The controlling issue on appeal is whether it was appropriate to impeach [a witness'] asserted lack of memory by showing substantive statements that she made when her memory was fresh. As a matter of logic, that is not appropriate impeachment by inconsistent statement. The fact that a witness once stated something was true is not logically inconsistent with a subsequent loss of memory. The only thing that is inconsistent with a claimed loss of memory is evidence that suggests that the witness in fact remembers.
James, 765 So.2d at 766 (quoting State v. Staley, 165 Or.App. 395, 995 P.2d 1217, 1220 (2000)).
In support of the contrary position, the State quotes from Morton v. State, 689 So.2d 259 (Fla.1997), where this Court determined that "[i]n a case where a witness gives both favorable and unfavorable testimony, the party calling the witness should usually be permitted to impeach the witness with a prior inconsistent statement." Id. at 264. However, the State fails to *201 include the very next sentence, where the Morton Court clarified its holding by stating that, "[o]f course, the statement should be truly inconsistent, and caution should be exercised in permitting impeachment of a witness who has given favorable testimony but simply fails to recall every detail unless the witness appears to be fabricating." Id.
Importantly, the trial judge in the instant case allowed the impeachment of Thomas's testimony because he found her testimony inconsistent to a degree with her prior statement, not because he determined that she was fabricating her inability to recall the content of her police statement. Given the other detailed evidence provided by Haley and the fact that Brooks' retrial occurred six years after the murders were committed, there is no basis on which to conclude that Thomas fabricated her lack of recollection. For that reason, the trial court erred in permitting the impeachment of Thomas's trial testimony with her previous statement. The State compounded the error by impermissibly relying on the impeachment as substantive evidence in closing arguments. See McNeil v. State, 433 So.2d 1294, 1295 (Fla. 1st DCA 1983) (reversing conviction based in large part on impeachment evidence improperly considered as substantive evidence).
Finally, we conclude that the trial court erred in refusing to provide the coconspirator hearsay instruction requested by defense counsel. Section 90.803(18)(e) of the Florida Statutes provides that "[u]pon request of counsel, the court shall instruct the jury that the conspiracy itself and each member's participation in it must be established by independent evidence, either before the introduction of any evidence or before evidence is admitted under this paragraph." § 90.803(18)(e), Fla. Stat. (2002). As characterized by Brooks on appeal, the requirement to give the instruction is mandatory, not permissive, and it is not within the trial court's discretion to refuse counsel's request.
Applying the standard articulated in DiGuilio, we determine that each of these errors was harmless beyond a reasonable doubt. See DiGuilio, 491 So.2d at 1135. We note that the substance of the notes retrieved from the leg cast of Davis was established through independent witness testimony. Air Force Special Agent Garcia relayed that Brooks denied being in Crestview the night of the murders, and indicated that he and Davis remained in Davis's apartment leaving only briefly to walk Davis's dog, Heavy. Airman Hardin testified that he accompanied Brooks to purchase a plane ticket back to Philadelphia for which Brooks was wired $244. With the information already a part of the record, there is no reasonable possibility that the erroneous admission of the notes themselves contributed to the conviction. The same conclusion can be drawn regarding the improper impeachment of Melissa Thomas. Permitting Agent Haley to testify to the prior statement of Thomas, in which she indicated that Brooks had changed into shorts in her bathroom, did not contribute to his conviction. Neither Thomas nor any of the witnesses who placed Brooks in Crestview on the night of the murders indicated that he or his clothes were covered in blood. The State did not recover or seek to introduce any blood-stained clothing. In the absence of any such evidence, testimony that Brooks changed clothes in Thomas's bathroom is of no consequence. Finally, given that sufficient evidence existed to establish a conspiracy between Gilliam, Brooks, and Davis beginning Monday, April 22, see Brooks I, 787 So.2d at 778, Brooks was not prejudiced by the trial court's refusal to give the coconspirator hearsay instruction *202 as requested. See Boyd v. State, 389 So.2d 642, 646 (Fla. 2d DCA 1980).

CUMULATIVE ERROR ANALYSIS
We have determined that five errors of law occurred during the course of Brooks' retrial, including the erroneous admission of Madero's testimony regarding the child support record, the erroneous admission of the notes recovered from Davis's leg cast, the improper impeachment of Melissa Thomas, the trial court's failure to provide the coconspirator hearsay instruction as requested by defense counsel, and the erroneous reliance in sentencing on the aggravating factor that the murders were committed during the course of an act of aggravated child abuse. Having found multiple harmless errors we must consider whether
even though there was competent substantial evidence to support a verdict. . . and even though each of the alleged errors, standing alone, could be considered harmless, the cumulative effect of such errors was such as to deny to defendant the fair and impartial trial that is the inalienable right of all litigants in this state and this nation.
Jackson v. State, 575 So.2d 181, 189 (Fla.1991) (quoting Seaboard Air Line R.R. Co. v. Ford, 92 So.2d 160, 165 (Fla.1956) (on rehearing)).
Our decision in Jackson is particularly instructive in this regard. There, we determined that the trial court had committed multiple errors, including the admission of a portion of a state witness's testimony explaining that members of the defendant's family had threatened him, permitting the State to tell the jury to draw inferences from the failure of the defendant's mother to testify, and instructing the jury that they could infer consciousness of guilt from flight. See id. at 187-88. We determined that the cumulative effect of those errors did not warrant reversal of the defendant's conviction because (1) none of the errors were fundamental; (2) none went to the heart of the state's case; and (3) the jury would have still heard substantial evidence in support of the defendant's guilt. See id. at 189. Thus this Court concluded, "Considering the weight of the errors and the magnitude of the totality of the evidence against Jackson, we find there is no reasonable possibility that these three errors contributed to the conviction." Id.
The errors committed in the instant case are of like kind and quality to those committed in Jackson. As in that case, we determine that none of the errors committed were fundamental, none went to the heart of the State's case, and, as outlined in the analysis of the admissibility of Madero's testimony, the jury would have still heard extensive and substantial evidence in support of Brooks' guilt. On the basis of the record before us, we determine that there is no reasonable possibility that the cumulative effect of the errors in this case contributed to Brooks' conviction.

BROOKS' THREAT AGAINST LAW ENFORCEMENT OFFICER
During Gilliam's testimony regarding the first failed attempt on Carlson's life, the trial court permitted him to relay that when he and Brooks were approached by the police officer after they had pulled behind Carlson's car, Brooks proclaimed that "he can't go back," and he was "going to have to shoot them," meaning the officer. Upon having his recollection refreshed with a previous statement, Gilliam testified that Brooks asserted he "can't go back to jail." Gilliam stated that he encouraged Brooks to put the shotgun away and that Brooks did so, hiding the shotgun under the seat covers in the back.
*203 Brooks does not challenge on appeal, and indeed this Court perceives no tenable grounds to challenge, the general admission of Gilliam's testimony regarding the events of April 22, including the circumstances surrounding Carlson's stop for speeding and law enforcement officers' subsequent questioning of Gilliam and Brooks. Brooks limits his challenge to the admissibility of his stated desire to shoot the police officer who approached Gilliam's vehicle rather than return to jail.
Abuse of discretion is the standard of review applicable to the instant claim. See, e.g., Ray, 755 So.2d at 610; Zack, 753 So.2d at 25. Evidence of a defendant's bad acts is inadmissible if solely relevant to demonstrate the bad character of the accused or the propensity of the accused to engage in criminal conduct. See Williams v. State, 110 So.2d 654, 663 (Fla.1959); see also § 90.404(2)(a), Fla. Stat. (2002). Evidence of bad acts is admissible, however, "if it casts light upon the character of the act under investigation by showing motive, intent, absence of mistake, common scheme, identity or a system or general pattern of criminality so that the evidence of the prior offenses would have a relevant or a material bearing on some essential aspect of the offense being tried." Williams, 110 So.2d at 662.
According to the State, the expressed intent of Brooks to shoot the police officer rather than return to jail was relevant to establish his guilty knowledge regarding his involvement in a criminal enterprise.[17] In support of this contention, the State directs our attention to two cases, Wyatt v. State, 641 So.2d 355 (Fla.1994), and Straight v. State, 397 So.2d 903 (Fla.1981). In Straight, this Court held:
When a suspected person in any manner attempts to escape or evade a threatened prosecution by flight, concealment, resistance to lawful arrest, or other indications after the fact of a desire to evade prosecution, such fact is admissible, being relevant to the consciousness of guilt which may be inferred from such circumstances.
397 So.2d at 908. Applying that principle, the Straight Court deemed relevant and admissible in a murder prosecution evidence of the defendant's flight and attempt to evade arrest. See id. at 908. In Wyatt, this Court applied the same principle in deeming admissible the defendant's statements to police officers upon his arrest that he "was glad he did not have a gun when he got stopped, otherwise he would have shot the officer." Wyatt, 641 So.2d at 358. In 1997, this Court refined the principle articulated in Straight to provide that there "must be evidence which indicates a nexus between the flight, concealment, or resistance to lawful arrest and the crime(s) for which the defendant is being tried in [a] specific case." Escobar v. State, 699 So.2d 988, 995 (Fla.1997), abrogated on other grounds by Connor v. State, 803 So.2d 598 (Fla.2001).
The principle articulated in Wyatt and Straight and refined in Escobar is equally applicable to the stated intent by Brooks to shoot the police officer to avoid returning to jail. The evidence shows that *204 at the time Brooks uttered the statement, he, Davis, and Gilliam were involved in a conspiracy to commit murder. The statement of Brooks demonstrates that he was aware of the criminality of his actions at the time of the traffic stop and the precarious position he was in with regard to the approaching officer.
The counter-argument, that the threat to shoot the officer has no relevance to the guilty knowledge of Brooks concerning the stabbing death of a mother and daughter committed two days later, misses the fundamental connection between the threat and the crime charged. Brooks did not make the threat in the context of a random traffic stop on any given day. He and Gilliam were following the intended victim, had the murder weapon and a pair of latex gloves in their possession, and, but for the traffic stop, would have proceeded to the predesignated place in Crestview to commit murder. Had the murder plan been foiled because of the police stop, due to the discovery by the police of the gun or some other piece of incriminating evidence, Brooks' statements certainly would be relevant and admissible under Wyatt and Straight. The relevancy of the threat voiced by Brooks against the law enforcement officer to his guilty knowledge is not diminished merely because his desire to evade prosecution and the successful completion of the planned crime were attenuated in time.
Though relevant, the statement by Brooks still may have been inadmissible if its probative value was outweighed by unfair prejudice. See § 90.403, Fla. Stat. (2002). Brooks argues that this is the case, and exhorts this Court to conduct the section 90.403 balancing test in accordance with the factors articulated in State v. McClain, 525 So.2d 420 (Fla.1988). In that case, this Court applied the principles advanced by Professor Ehrhardt for weighing the probative value of evidence against the threat of unfair prejudice, including the need for the evidence, the tendency of the evidence to suggest an improper basis to the jury for resolving the matter, the chain of inference necessary to establish the material fact, and the efficacy of any limiting instruction. See id. at 422.
According to Brooks, the evidence "fails" the balancing test because the other portions of Gilliam's testimony amply demonstrated Brooks' intent, and the threat against the police officer simply portrayed Brooks as an individual determined to kill anyone who might send him back to jail. We disagree. The proffered analysis underestimates the probative value of the evidence. While Gilliam's testimony tends to establish the existence of a conspiracy, the statements by Brooks more clearly provide the proof of his individual intent to commit murder and acknowledgment of guilt. Moreover, in a case such as this, which involved the stabbing death of a woman and her infant child, introduction of the threat by Brooks against the police officer was unlikely to suggest an improper basis to the jury for resolving the matter.

CHANGE OF VENUE
Brooks also argues that the trial court erred in failing to grant his change of venue request. Conceding that he did not exhaust his peremptory challenges or request additional challenges during jury selection, Brooks contends that the problem he faced empaneling an unbiased jury was systemic and beyond the scope of individual jurors. Brooks further argues that the venue challenge involved more than just pretrial publicity, but also a demonstrated prejudice against him as evidenced by several factors, including discussions about the case among members of *205 the jury pool and the purportedly deceptive answers given during voir dire.[18]
As in his initial appeal, where Brooks presented a claim of error based on the trial court's refusal to strike the venire and change venue, his instant claim does not satisfy the standard set forth in Rolling v. State, 695 So.2d 278 (Fla.1997), for measuring prejudice in the trial community. Rolling requires a determination of "whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and the accompanying prejudice, bias, and pre-conceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom." Id. at 284 (quoting McCaskill v. State, 344 So.2d 1276, 1278 (Fla.1977)).
The trial court conducted an individual voir dire of every prospective juror who indicated that he or she had any knowledge regarding the case beyond the scant facts outlined by the State at the commencement of voir dire. These jurors were questioned regarding their knowledge of the case and the previous legal proceedings and the impact any such knowledge would have on their fairness and impartiality. The parties agreed toward the end of the voir dire process that anyone who knew that Brooks was being retried would be excused, regardless of whether they indicated that such knowledge would impact their ability to serve. Thus, the twelve persons who were actually part of the jury below possessed that which the parties determined was an acceptable level of knowledge regarding the facts of the case and no knowledge of the previous conviction resulting from the earlier trial.
With regard to the purported discussions among prospective jurors about the status of the case, the contention advanced by Brooks fails to account for the fact that the trial court and counsel thoroughly questioned each of the jurors involved in the discussions and eliminated any juror with any knowledge regarding the status of the case as a retrial. Brooks also draws our attention to one potential juror's report of hearing a female member of the jury pool uttering aloud her presumption of guilt in the instant matter. However, the trial court and counsel exhaustively questioned the potential juror making the report, who could not identify the woman who allegedly made such a statement, and none of the potential jurors seated in the area could corroborate his story. Finally, the contention that potential jurors gave arguably deceptive answers must fail as the two individuals identified by Brooks as giving evasive answers did not serve on his jury panel. There is simply no basis in the record to support the contention that anyone on the jury in this case knew that Brooks was being tried a second time, let *206 alone harbored presumptions based on that fact, or was prejudiced against him for any other reason.

AGGRAVATING FACTORS APPLICABLE TO ALEXIS STUART
Brooks next challenges the trial court's findings with regard to the aggravating factors applicable to the murder of Alexis Stuart. According to Brooks, the evidence does not establish that Brooks murdered Stuart for pecuniary gain or that Brooks killed Stuart as part of the premeditated plan to murder Carlson.
The standard of review for whether an aggravating factor exists is whether it is supported by competent, substantial evidence. See Almeida v. State, 748 So.2d 922, 932 (Fla.1999). Aggravating factors require proof beyond a reasonable doubt, "not mere speculation derived from equivocal evidence or testimony." Hardwick v. State, 521 So.2d 1071, 1075 (Fla.1988). An aggravating factor may be supported entirely by circumstantial evidence, but "the circumstantial evidence must be inconsistent with any reasonable hypothesis which might negate the aggravating factor." Hildwin v. State, 727 So.2d 193, 194 (Fla.1998) (quoting Geralds v. State, 601 So.2d 1157, 1163 (Fla.1992)).
The pecuniary gain factor is permitted where the murder "is an integral step in obtaining some sought-after specific gain." Hardwick, 521 So.2d at 1076. In the instant case, the trial court determined that the only motivating reason for Brooks to murder Stuart was to collect the $10,000 promised by Davis. This determination is supported by competent, substantial evidence.
The direct evidence adduced at trial was that Brooks had been promised $10,000 for the murder of Carlson. The only logical inference to be drawn from the promise of such a large sum of money, coupled with evidence demonstrating that Davis was of limited economic means, is that Davis and Brooks knew of the existence of the $100,000 insurance policy on Stuart's life and the need to kill the baby to obtain the proceeds. Such evidence establishes that the elimination of Stuart was an "integral step" in obtaining the $10,000 and, as such, amply supports the trial court's finding of the pecuniary gain aggravating factor. See Hardwick, 521 So.2d at 1076.
The trial court's determination that the murder of Alexis Stuart was committed in a cold, calculated, and premeditated manner is also supported by competent substantial evidence. As discussed above, the baby's murder was part of the prearranged plan hatched by Davis and Brooks and was necessary for Brooks to obtain the $10,000 promised. Gilliam's averred ignorance of Alexis Stuart's existence or a plan to murder the baby does not, as Brooks contends, undermine the trial court's conclusion. As previously discussed, Brooks would have been more familiar with the economic status of Davis and his modest finances and naturally more inquisitive with regard to the source of the $10,000 payment. Brooks also admitted to knowing about the baby and that his cousin had denied paternity. Record evidence further demonstrates that Gilliam was not privy to every aspect of the murder plan, with Brooks and Davis stepping behind closed doors to discuss the plan out of Gilliam's earshot.
Furthermore, even if a prearranged plan to murder Stuart was not shown, the CCP aggravator is nonetheless properly applied in the instant case. As this Court has determined, the cold, calculated, and premeditated aggravating factor can be supported by evidence that the defendant planned to kill, even if the actual *207 victim was other than the intended victim. See Bell v. State, 699 So.2d 674, 677 (Fla.1997) (determining that application of CCP was not precluded where the victims murdered were not the actual subjects of the defendant's plan to kill). To establish the existence of CCP, "the State must show a heightened level of premeditation establishing that the defendant had a careful plan or prearranged design to kill," but that heightened premeditation "does not have to be directed toward the specific victim." Id. at 677-78; see also Sweet v. State, 624 So.2d 1138, 1142 (Fla.1993) ("It is the manner of the killing, not the target, which is the focus of [the CCP] aggravator.").
Mark Gilliam's testimony regarding the failed attempts by the trio on Carlson's life, the plan to commit the act at a predesignated spot in a high crime neighborhood, Brooks' possession of the murder weapon and latex gloves, and discussion  at least with respect to Gilliam  of a viable cover up story leaves no reasonable doubt that Brooks had a prearranged design to kill. See Bell, 699 So.2d at 677 ("Cold, calculated, premeditated murder can be indicated by the circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course."). Thus, the CCP aggravator applies to Stuart's murder, regardless of whether she was the primary intended victim. Moreover, the trial court's finding that Stuart was killed with one fatal blow to the heart, followed by the infliction of postmortem mutilation wounds is supported by competent, substantial evidence,[19] and further bolsters the application of the CCP aggravator to the murder of Stuart because it reflects a desire to make both murders appear to be slashing murders.

CLOSING ARGUMENTS
Brooks contends that the State made multiple improper statements in its closing argument. According to Brooks, the State shifted the burden to him to prove his innocence by questioning his failure to tell the police about the insurance policy and by constructing straw man defenses, improperly stated that Brooks was responsible for Davis's actions that occurred outside of the conspiracy, and impermissibly attacked a purported "alibi" that Brooks never presented. To merit a new trial, the prosecutor's comments "must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise." Spencer v. State, 645 So.2d 377, 383 (Fla.1994).
After a close review of the record, we conclude that Brooks mischaracterizes the proceedings and that no improper burden-shifting occurred. To the contrary, the comments challenged by Brooks constitute permissible comment on the evidence presented, see Morrison v. State, 818 So.2d 432, 445-46 (Fla.2002), and defenses raised. See Lynn v. State, 395 So.2d 621, 623 (Fla. 1st DCA 1981). Similarly, to the extent the prosecutor's closing arguments created a misimpression regarding the law of principals, it was properly clarified by the trial court's instruction on that point. See Bush v. State, 809 So.2d 107, 117 (Fla. 4th DCA 2002). Finally, we determine that the State did not improperly construct an alibi defense for the purpose of challenging *208 it. The State did not make reference to the failure of Brooks to call an alibi witness or make insinuations designed to undermine the viability of any alibi defense that the State itself introduced.

REFERENCES TO PREVIOUS TRIAL
Brooks also argues that the trial court erred in denying his motion for mistrial based on the State's repeated references to his previous trial. After a review of the challenged comments in the context of the entire record, we determine that the references to Brooks' previous trial were plainly inadvertent and almost inscrutable since they were made during the course of complicated sequences of questions regarding prior statements by witnesses in this matter. Moreover, none revealed that Brooks had been convicted. On this basis, we conclude that the trial court did not err in refusing to grant Brooks' motion for mistrial. Compare Jackson v. State, 545 So.2d 260, 263 (Fla.1989) (determining that prosecution's intentional solicitation of testimony regarding the appellant's prior conviction was reversible error) with Sireci v. State, 587 So.2d 450, 452 (Fla.1991) (determining that refusal to grant mistrial based on prosecutor's reference to appellant's time on death row was not in error where the record reflected that the impact of merely mentioning a prior death sentence was negligible).

PROPORTIONALITY
Brooks also argues that the death penalty is proportionately unwarranted in the instant case. According to Brooks, his death sentences are disproportionate because Davis instigated, planned, and helped carry out the murders of Carlson and Stuart, yet received life sentences. Brooks contends that this Court must reduce a death sentence where, as here, a codefendant who is equally or more culpable in the murder is sentenced to life. Brooks further posits that the evidence does not support the trial court's conclusion that Brooks actually committed the murders.
This Court has an obligation to review the proportionality of death sentences by considering the totality of the circumstances of the case and comparing the sentence with that imposed in other capital cases. See Shere v. Moore, 830 So.2d 56, 60 (Fla.2002). In cases where more than one defendant is involved, the Court performs an additional analysis of relative culpability guided by the principle that "equally culpable co-defendants should be treated alike in capital sentencing and receive equal punishment." Id. A trial court's determination regarding relative culpability constitutes a finding of fact and will be sustained on review if supported by competent, substantial evidence. See Puccio v. State, 701 So.2d 858, 860 (Fla.1997).
In the sentencing order, the trial court gave little mitigatory weight to the fact that Davis received a life sentence. In so determining, the trial court made the following finding:
In analyzing the life sentence imposed on Walker Davis, Jr., it is important to acknowledge that although Walker Davis, Jr. participated in the planning and to some extent in the murder of the two victims, the evidence showed that Davis was the front seat passenger of the vehicle and did not deliver the fatal blows to either of the victims. Lamar Brooks stated to Terrance Goodman that on the night of the murders he was the backseat passenger of Rachel Carlson's car. This admission coupled with the testimony of the medical examiner and the bloodstain pattern expert establishes that Lamar Brooks was the occupant *209 of the car who carried out the plan to murder both the victims.
This Court is satisfied from the totality of the evidence that Lamar Brooks not only participated in the planning of the murders of the two victims, but actually carried out the plan by fatally stabbing each of the victims. Therefore, Lamar Brooks is more culpable than Walker Davis, Jr., in the murders of Rachel Carlson and Alexis Stuart.
The trial court's findings regarding the relative culpability of Davis and Brooks are supported by competent, substantial evidence.
As previously discussed, competent, substantial evidence introduced during the guilt phase established that the fatal blows inflicted on each of the victims were delivered by an individual seated in the rear seat on the driver's side of Carlson's car, and that Brooks was that individual. Additional evidence introduced during the Spencer hearing supported that conclusion. At that time, the State introduced the testimony of Terrance Goodman, Brooks' former cellmate. According to Goodman, Brooks discussed "offing a broad" one night when he was high, but never directly admitted to killing Carlson or Stuart. Goodman also testified that Brooks reported being in the back seat of the car listening to a personal, portable stereo the night he committed the murder.
Brooks challenges the quality of Goodman's recollection, noting the relative ambiguity and inconclusiveness of his responses. However, the trial court, the tribunal in the best position to judge witness credibility, gave credence to Goodman's testimony. There is no basis for this Court to supplant the deferential standard of review accorded such decisions. See Shaw v. Shaw, 334 So.2d 13, 16 (Fla.1976) (reiterating that the trial court is in a superior position "to evaluate and weigh the testimony and evidence based upon its observation of the bearing, demeanor and credibility of the witnesses"). Moreover, the trial court made clear that it based the weight it accorded to Davis's life sentence on the totality of the evidence in the case.
Contrary to Brooks' assertion, disparate treatment of Brooks as the "knifeman" in the instant case is warranted. See, e.g., Downs v. State, 572 So.2d 895 (Fla.1990) (determining that evidence supported the trial court's conclusion that Downs was the triggerman and thus more culpable than his codefendant); Slater v. State, 316 So.2d 539 (Fla.1975) (determining death penalty disproportionate where the triggerman received a life sentence and the accomplice was sentenced to death). Our decision in Gamble v. State, 659 So.2d 242 (Fla.1995), is particularly relevant. There, we found no error relative to the trial court's decision to ascribe "some" mitigatory weight to the codefendant's life sentence. See id. at 245. In that case, both codefendants planned and executed the bludgeoning and strangulation murder of their landlord. See id. at 244. Both co-defendants were at the murder scene at the time of the murder, and there was some question as to which was responsible for actually killing the victim. See id. The jury recommended the sentence of death for Gamble by a ten-to-two majority, and the trial court followed that recommendation. See id. After the close of Gamble's penalty phase, Love, Gamble's codefendant, pled guilty to first-degree murder in exchange for a life sentence. See id. at 245. This Court rejected the assertion that the distinction between the sentences rendered Gamble's death sentence disproportionate. See id.
As in Gamble, both Davis and Brooks planned and executed the murder of Carlson and Stuart. Like codefendant Love in *210 Gamble, Davis was present at the murder scene at the time of the murders, and may have helped inflict some of the nonfatal injuries suffered by Carlson. However, evidence establishes that Davis did not inflict the fatal injuries, and, judging from the blood spatter evidence, was not even present in Carlson's vehicle at the time the lethal stab wounds were delivered. For these reasons, the trial court did not err in determining that Brooks' relative culpability for the murders exceeded that of Davis and in ascribing little weight to Davis's life sentence. See Gamble, 659 So.2d at 245; see also Gordon v. State, 704 So.2d 107, 117-18 (Fla.1997) (rejecting disproportionality argument where conspirator who had instigated and paid for the contract killing and supplied the killers with a cell phone to call the victim's home and place of work received a life sentence after a jury trial and the conspirator actually responsible for the killing received a death sentence).

REMAINING CLAIMS
Finally, Brooks argues that the trial court erred in refusing to require the jury to return a special verdict setting forth which aggravators they found and by what vote in violation of Brooks' right to a trial by jury under the Sixth Amendment to the United States Constitution and the Eighth Amendment proscription against cruel and unusual punishment. This claim is meritless. See Johnson v. State, 904 So.2d 400 (Fla. 2005).
Brooks also argues that the trial court violated the procedure set forth in section 921.141 of the Florida Statutes, and the Eighth Amendment to the United States Constitution in giving great weight to the jury's sentencing recommendation. Brooks' challenge on this issue is two-fold. First, he claims that the trial court violated this Court's holding in Muhammad v. State, 782 So.2d 343 (Fla.2001), by according the recommendation of Brooks' penalty phase jury great weight despite the fact that Brooks waived the presentation of mitigating evidence. In Muhammad, we determined that reversible error occurred when the trial court afforded "great weight" to the jury's recommendation when that jury did not hear any evidence in mitigation. See id. at 363. The jury instructions in that case informed the jury that their recommendation would be given great weight, see id. at 363 n. 9, and the sentencing order specifically stated that the jury's recommendation was given great weight in the final sentencing decision. See id. at 363.
In the instant matter, by contrast, the trial court did not instruct the jury that its sentencing recommendation would be given great weight. Likewise, the sentencing order makes no reference to the weight actually accorded the recommendation. Indeed, the length, thoroughness, and tone of the sentencing order strongly imply that the trial judge's sentencing determination is based on the weighing of the aggravating and mitigating factors and on the jury's recommendation. Thus, the record establishes that the trial court properly viewed the jury's recommendation as required by Muhammad.
Brooks also argues that the trial court should have required the presentation of mitigating evidence, most notably Davis's life sentence, to the jury. There is nothing in existing case law that would require the trial court to take that step. The decision in Muhammad simply requires trial courts presiding over cases in which the defendant waives mitigating evidence to "require the preparation of a PSI [presentence investigation]," and permits the court to call witnesses in mitigation to the extent the PSI "alert[s] the trial court to the probability of significant mitigation." Id. at 363-64. The decision in Muhammad *211 did not compel the trial court to present Davis's life sentence to the jury. This conclusion is bolstered by the strength of the trial court's findings with regard to the relative culpability of Brooks and Davis  a determination that is amply supported by the record.

CONCLUSION
For the foregoing reasons, we affirm Brooks' convictions of first-degree murder and death sentences.
It is so ordered.
QUINCE and CANTERO, JJ., concur.
PARIENTE, C.J., concurs in part and dissents in part with an opinion, in which ANSTEAD, J., concurs.
LEWIS, J., concurs in part and dissents in part with an opinion, in which WELLS and BELL, JJ., concur.
PARIENTE, C.J., concurring in part and dissenting in part.
I agree with the majority that there could be no crime of aggravated child abuse based on a single stab wound because that crime merges with the homicide. I thus concur in that part of the majority opinion. However, I would reverse the convictions based on the erroneous admission of evidence identifying Walker Davis as the primary beneficiary of a life insurance policy on Alexis Stuart, the infant child of Davis's paramour, Rachel Carlson. Because the State did not lay a proper foundation in the form of knowledge of the policy by Brooks, Davis's alleged codefendant, the policy was inadmissible against Brooks either to establish the source of payment for the murders of Stuart and Carlson or to show Brooks' motive or intent. The error in admitting the life insurance policy was not harmless beyond a reasonable doubt in light of the absence of direct evidence of Brooks' culpability and the dubious credibility of the State's key witness.
To place this issue in context, the evidence in this case was wholly circumstantial, focusing on the proximity of Davis and Brooks to the murder scene, Brooks' false statements as to his whereabouts on the night of the murders, and the testimony of convicted perjurer Mark Gilliam, who testified that Davis promised to pay Brooks $10,000 for participating in the killing.[20] In contrast to Brooks' first trial, the jury did not hear Davis's statements attempting to shift investigators' focus to Brooks, which we subsequently held inadmissible, see Brooks v. State, 787 So.2d 765, 777 (Fla.2001), and there was no testimony that Brooks discussed his role in the killings with a jailhouse informant. Lacking direct evidence or an admission of guilt, the State introduced evidence of the life insurance policy on Stuart, although we had held Davis's statements in applying for the policy inadmissible in Brooks' first trial. See id. at 773.[21] The trial court admitted the life insurance policy solely to show the source of the payment of the $10,000, but the State clearly used the policy as evidence of Brooks' motive to kill Carlson and Stuart, despite the complete absence of evidence that Brooks knew of the existence of the policy.
*212 As in the first appeal, in which we held that statements regarding the policy taken out by Davis were inadmissible to establish Brooks' motive, the policy itself was inadmissible in Brooks' second trial to either supply a motive for Brooks or establish the source of payment. Although the trial court admitted the life insurance policy for the limited purpose of showing the source of payment, as the majority correctly points out, the two factual issues were intertwined in that Brooks would have had a motive to kill Stuart if he had known that the life insurance proceeds would provide the source of the promised payment for the murder of Carlson. In this regard, knowledge of the life insurance policy is the predicate to admissibility for either motive or source of payment.
The State not only failed to present evidence that Brooks knew of the policy but also failed to show that Davis acquired the policy in furtherance of a conspiracy to commit murder. The evidence shows that Davis obtained the policy on Stuart two months before the killings, prior to the inception of any murder conspiracy. There was no evidence that Brooks was present during any discussion about the life insurance policy. In fact, there was no testimony that Stuart was even an intended victim of the conspiracy to kill her mother. The immunized coconspirator, Gilliam, testified that he was to have been paid $500 each by Brooks and Davis to drive a car as part of the plot to kill Carlson. Gilliam also testified that in all the discussions he had with Davis and Brooks about killing Carlson, there was no mention of killing Stuart and no mention of an insurance policy on her life.
The majority correctly observes that there must be a nexus between the life insurance policy and the crime, citing the Georgia Supreme Court decisions in Stoudemire v. State, 261 Ga. 49, 401 S.E.2d 482, 484 (1991), and Givens v. State, 273 Ga. 818, 546 S.E.2d 509, 513 (2001). However, these cases hinged on the linchpin of knowledge. Where knowledge of the policy was shown, admission was approved; where the prosecution did not present evidence that the defendant knew of the policy, its admission was in error. See id. at 513 (stating that witness's testimony that defendant "promised to give him money for killing the victim from the insurance proceeds satisfies the nexus requirement"); Stoudemire, 401 S.E.2d at 484 (ruling inadmissible an insurance policy that was introduced "with absolutely no showing whatsoever of a nexus between the existence of the policy and the commission of the crime").
Courts in other states have found reversible error in the admission of evidence of life insurance policies under similar circumstances. For example, in Smallwood v. Commonwealth, 36 Va.App. 483, 553 S.E.2d 140, 145-46 (2001), the appellate court reversed a murder conviction in part because the trial court erroneously admitted a statement that one week before the murder, the victim had submitted a form requesting to make the defendant the beneficiary of her life insurance policy. There was no evidence that the defendant knew that his wife was making him the beneficiary of her policy, and thus no proper foundation was laid for the policy's admissibility. See id. at 146. Significantly, the court rejected the argument that the marital bond between the defendant and victim was sufficient alone to establish that the defendant knew of the existence of the insurance policy and the change in beneficiaries:
[The State] produced no evidence, direct or circumstantial, to establish appellant knew about the proposed change [of beneficiary]. Although [the wife] submitted the form less than a week prior *213 to the murder, that circumstance allows only for idle speculation that appellant knew about the submission.
Id. The court explained that where motive is a material issue, any fact or circumstance establishing a party's motive must be shown to have probably been known by the party, "[f]or a man cannot be influenced or moved to act by a fact or circumstance of which he is ignorant." Id. at 145 (quoting Mullins v. Commonwealth, 113 Va. 787, 75 S.E. 193, 195 (1912)).
The holding in Smallwood is in accord with the law in other jurisdictions. See Hutchins v. State, 171 Ga.App. 309, 319 S.E.2d 130, 131 (1984) (holding that it was error to admit life insurance policy on victim where there was no showing that defendant knew she was the beneficiary named in the policy); People v. Gougas, 410 Ill. 235, 102 N.E.2d 152, 154 (1951) (holding life insurance policy on deceased of which accused was a partial beneficiary inadmissible in murder prosecution to show motive, where accused was without knowledge of policy's existence); State v. Haley, 39 Wash.App. 164, 692 P.2d 858, 862 (1984) (holding that life insurance policy was erroneously admitted where defendant, victim's divorced spouse, testified she was unaware she remained beneficiary of policy); State v. Leuch, 198 Wash. 331, 88 P.2d 440, 442-43 (1939) (holding, in case in which evidence showed that defendant directed agent to write life insurance policy on the victim, that question of whether defendant knew the policy was in force was for the jury).
As stated in Hutchins, "[w]hile evidence tending to show a motive for commission of the crime charged is admissible in a prosecution for homicide, it is essential that the facts on which the motive is assigned shall be within the knowledge of the person accused." 319 S.E.2d at 131. This rule is consistent with the principle providing that "an inference may be admissible into evidence, even though it is based upon another inference, if the other inference has been shown to exist beyond a reasonable doubt." Benson v. State, 526 So.2d 948, 953 (Fla. 2d DCA 1988); see also Voelker v. Combined Ins. Co. of Am., 73 So.2d 403, 407 (Fla.1954) (stating that rule in criminal cases is that one inference may be deduced from another to establish an ultimate fact "only if the prior or basic inference is established to the exclusion of any other reasonable theory should another be drawn from it"). Here, the initial inference, that Brooks knew of the existence of the life insurance policy, was not established to the exclusion of a reasonable theory that Davis never made Brooks aware of the policy.
In comparison, courts approving admission of life insurance policies against defendants who were not beneficiaries of the policies have relied on evidence showing that the defendants were aware of the policies. See Whittington v. State, 252 Ga. 168, 313 S.E.2d 73, 79 (1984) (determining that evidence of insurance policy was relevant to motive in prosecution of defendant who was not beneficiary where victim's husband informed defendant "there was a lot of insurance" on the victim); State v. Bird, 238 Kan. 160, 708 P.2d 946, 961 (1985) (holding life insurance policy admissible in prosecution for solicitation to commit murder on behalf of victim's wife where defendant told another person that victim had large life insurance policy); Tidrow v. State, 916 S.W.2d 623, 630 (Tex. App.1996) (finding evidence of insurance policy relevant in contract killing where statements of principals made clear that "remuneration to [the defendant] for his role in the murder was to come from insurance proceeds").
Either when the defendant is a beneficiary of the policy or is alleged to have *214 committed the murder on behalf of a beneficiary, the prosecution must at a minimum present evidence from which a jury could find that the accused probably knew of the policy's existence. See Smallwood, 553 S.E.2d at 145. For example, the North Carolina Supreme Court held a life insurance policy on the defendant's stepchild admissible where the defendant's husband was a life insurance agent and it could reasonably be inferred that the defendant knew that family members were insured and that her husband would tell her she was named co-beneficiary of the policy. See State v. White, 340 N.C. 264, 457 S.E.2d 841, 858 (1995).
The facts of this case are not analogous. Brooks was merely Davis's cousin and he was neither named as a beneficiary nor otherwise involved in procuring the policy. The majority permits an inference of Brooks' knowledge of the policy based on a determination that "it strains credulity to conclude that Brooks and Davis would not have considered the source from which Davis planned to obtain the $10,000." The inference rests on nothing more than speculation.
The trial court correctly determined that the life insurance policy taken out by Davis in which he was a named beneficiary was inadmissible to prove Brooks' motive. However, the trial court erred when it decided that the policy could be admitted to show the source of the payment to Brooks. There was no evidence that Brooks received any payment after the murders. Further, Brooks never made the source of the payment an issue at trial; his defense was that he was never involved in the murders. Thus, the relevance of the policy to show that Davis would be able to pay Brooks the price allegedly promised for killing Carlson was minimal at best.
In addition, the credibility of Gilliam, the only witness to testify that Brooks was to be paid, was so tenuous that the jury may have rejected his testimony about the promise of payment to Brooks. This is significant in that the promise of payment was used as the evidentiary bridge to the life insurance policy. If Gilliam had not testified that Davis promised to pay Brooks a large sum of money, the policy would have been inadmissible against Brooks. And if the promised payment had been smaller, as Gilliam had previously testified, the majority might have discounted the relevance of the source of the payment. Despite the weakness of this evidentiary bridge, the assertion that a three-month-old infant was killed as part of an insurance scam perpetrated by Davis was so inflammatory that jurors could not possibly ignore it. Because Davis was not on trial, the jury had only its verdict on Brooks in which to express outrage at the cold-blooded murder committed with such a sinister motive. Thus, any probative value in admitting a life insurance policy that was not linked to Brooks in any way was outweighed by the potential for unfair prejudice, requiring its exclusion under section 90.403, Florida Statutes (2004).
The other decisions relied upon by the majority for admission of the policy are distinguishable. In Dyas v. State, 260 Ark. 303, 539 S.W.2d 251, 261 (1976), the appellate court held that life insurance policies on the victim were relevant for the limited purpose of explaining the ability of the victim's wife to pay the defendant and an accomplice twice as much after the murder as the original contract had stipulated would be paid in advance of the killing. Here, in contrast, the State presented no testimony of a renegotiation of either the fee or the timing of payment. Further, the defense made no issue of the source of the payment.
The majority also relies on Strickland v. State, 122 Fla. 384, 165 So. 289 (1936), in which this Court stated:

*215 A material fact to the issue in this case was motive, not only motive of the accused which was shown to be that of pecuniary gain, but also in establishing the fact that McCall was the actor in hiring the accused to commit the act which caused the death of Spear it was material to show that there was a motive for McCall to hire Strickland to perform that act. The motive which actuated McCall was material because that motive would show, or tend to show, a reason why he would be willing to pay Strickland to commit the murder.
Id. at 290. Here, unlike Strickland, there was no question that if Brooks was involved in the killings, he was acting on Davis's behalf. Further, Strickland does not mention a life insurance policy or otherwise reveal the specific evidence allegedly motivating the coconspirator, McCall, and does not reveal whether the evidence supporting McCall's motive had any bearing on Strickland's agreement to commit the murder for hire.
The error in admitting the evidence of the policy without a showing that Brooks knew of its existence was not harmless beyond a reasonable doubt. As in Brooks' first trial, "no physical or direct evidence linked him to the crimes." Brooks, 787 So.2d at 769. Defense counsel never argued either in opening or closing that, Brooks lacked a motive for the killings. In contrast, several times during closing argument, the prosecutor drew the jury's attention to the life insurance policy as a significant motivating factor both for Davis, who was not on trial, and for Brooks. The State pointed to the life insurance policy in opening statement to connect Brooks to Davis's "sinister motive" in orchestrating the murders, and asserted in closing argument that Brooks committed the killing for "his share of that [life insurance] money." The use of the policy in the State's guilt-phase closing argument was pervasive:
This was a planned, premeditated, thought-out execution to help Walker Davis, Jr., avoid the responsibilities of a child that he signed an insurance and bought an insurance policy claiming he was the father of.
. . . .
That life insurance policy bought by Walker Davis, Jr., in the amount of one hundred thousand dollars for an infant that he told Lamar Brooks was not even his, for an infant he couldn't afford to have in his life because he was already married, he already had two children, he already had a third child. His wife had just given birth. That's evidence of premeditation.
. . . .
What was Walker Davis, Jr.'s motivation" He was married. He's got three children. He's got a brand new baby by his wife. Rachel Carlson wanted child support from him. Rachel Carlson was constantly coming over to his house crying and upset. He was going to have to deal with that for seventeen years and nine months if he didn't do something about it, and he admitted paternity of that child on the insurance application, and that's really the true evidence of motive, isn't it" He bought a hundred thousand dollar insurance policy on a baby that he told this defendant wasn't even his. That's what Lamar Brooks told Bettis and Hollinshead during his interview on Friday, April 26th. [[22]] He *216 bought a hundred thousand dollars worth of insurance, not a burial policy. That's not any kind of burial anybody's ever heard about, not two thousand, not three thousand, not five thousand, not even ten thousand. One hundred thousand dollars. Perhaps Mr. Funk, like Mr. Scachacz, will tell you that doesn't mean anything. You know it does. It speaks volumes about what happened to Alexis Stuart. Who else stood to benefit under the evidence from the death of this child? Who else, besides Walker Davis, Jr., and his cousin, Lamar Brooks? No one. No one else would benefit from the heinous murder of this child. What about Lamar Brooks' motive? Well it's clear. His share of that money. He didn't have any money, couldn't even afford to fly home.... Had no car. Ten thousand dollars for him to commit the murders of two innocent people. His cousin was the person whose problem Rachel Carlson and Alexis Stuart created, his cousin, Walker Davis, Jr. Money and family, that was Lamar Brooks' motive.
. . . .
Well, the money had to come from somewhere, ladies and gentleman, didn't it? Didn't it have to come from somewhere? He was to get ten thousand dollars, thousands of dollars. . . . Now Walker Davis was just an airman, he had no car, he had no phone, he had no money in the bank. . . . Ladies and gentlemen, it's a reasonable inference that he had to tell Lamar Brooks where he was going to come up with the money to pay him to help commit this murder.[[23]]
Under these circumstances, the unproven implication that Brooks knew of the insurance policy and was therefore more strongly motivated to commit the murders most certainly could have affected the verdict.
I acknowledge that the State presented a tremendous amount of evidence circumstantially incriminating Brooks and Davis, including their presence near the murder scene. However, the test for harmlessness
is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact. The question is whether there is a reasonable possibility that the error affected the verdict. The burden to show the error was harmless must remain on the state. If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.
State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986). In light of the absence of direct or compelling forensic evidence of Brooks' complicity in these murders as well as the dubious credibility of the State's key witness, I cannot conclude beyond a reasonable doubt that the errors in admitting the life insurance policy, combined with the erroneous admission of the evidence from the child support caseworker on which Brooks also was not shown to *217 have any knowledge, did not affect the verdict. Accordingly, I would again reverse Brooks' convictions and remand for a new trial.
Finally, I concur in the majority's determination that the underlying felony of aggravated child abuse merges with the homicide for the killing of Stuart with a single stab wound, invalidating the "murder in the course of a felony" aggravator found by the trial court as to both victims. If both murder convictions were reversed, as I believe they should be, this issue would become relevant only in the event of a capital penalty phase after retrial. However, given the majority's affirmance of the convictions, the determination that the aggravator should be stricken necessitates a harmless error analysis. In light of the alternative aggravating factor for a victim under twelve, rejected because it would have been improperly doubled with the murder in the course of a felony aggravator, I agree with the majority that the error is harmless as to the sentence for the murder of Stuart. The error is also harmless on the sentence for the murder of Carlson, on which, unlike the murder of Stuart, the trial court found the additional aggravating factor that the murder was especially heinous, atrocious, or cruel.
ANSTEAD, J., concurs.
LEWIS, J., concurring in part and dissenting in part.
I fully concur with the majority's decision to affirm Brooks' convictions and sentences for the murders of Rachel Carlson and her infant daughter, Alexis Stuart. I also concur with the reasoning employed by the majority in addressing each claim of error asserted by Brooks with one exception. I cannot agree with the majority's determination that aggravated child abuse was not available for consideration in the instant matter because Brooks inflicted only one lethal stabbing blow on the infant's body. In so doing, the majority has, in my view, misapplied judicial precedent to void aggravated child abuse as an aggravating circumstance for sentencing and also eliminated aggravated child abuse as a felony underlying application of the felony murder doctrine in any case involving the perpetration of a single act of violence on a child. I believe the result in this case contravenes the plain language of the felony murder statute and is directly contrary to the Legislature's intent in amending that statute to include the felony of aggravated child abuse as a basis for application of the doctrine of felony murder and as a factor to be weighed in aggravation in the sentencing determination. With this severely limiting decision, it is now necessary that the Florida Legislature reexamine and reevaluate this issue to determine if its intent has now been frustrated and whether any modifications are appropriate.
Brooks was charged with two counts of first-degree murder on the alternative theories of premeditated murder and felony murder with a weapon for the murders of Rachel Carlson and Alexis Stuart. Brooks was not independently charged with nor was he convicted of the felony of aggravated child abuse. Brooks was convicted by a general jury verdict of two counts of first-degree murder.
On appeal to this Court, Brooks has argued that the trial court erred by finding that he committed the murders during the course of aggravated child abuse and then also invoking the aggravated child abuse aggravator, as set forth in section 921.141(5)(d) of the Florida Statutes, during sentencing. Brooks contends that because Alexis Stuart was slain with a single stabbing blow, the trial court should have found that the child abuse allegation totally merged with the more serious homicide charges. Ultimately, under Brooks' interpretation *218 of the law, the State should have been limited to proving first-degree murder exclusively on the theory of premeditation and should have been absolutely precluded from applying the aggravated child abuse aggravating circumstance in sentencing under these facts, a principle of law accepted and advanced by the majority today.
The majority opinion adopts and endorses Brooks' view and applies the rule of law established in Mills v. State, 476 So.2d 172 (Fla.1985), to totally void aggravated child abuse as both a basis for any felony murder conviction and as a statutory aggravator in sentencing under these circumstances. However, there are salient differences between Mills and the present case which, in my view, render the rule established in Mills entirely in apposite to resolution of the matters now before the Court.
In Mills, the indictment charged the defendant with one count of felony murder with burglary as the underlying felony, one count of burglary while armed with a firearm, and one count of aggravated battery with a firearm. See id. at 177.[24] The defendant in Mills had broken into the victim's home with an intent to steal, and when discovered, killed the victim with a single shotgun blast. See id. at 174. The defendant was convicted on all counts. See id. As noted, in the case we consider today no separate felony was charged, unlike Mills.
On appeal, Mills argued that his aggravated battery conviction was invalid because aggravated battery is a lesser included offense of first-degree murder. See id. at 177. After reviewing the statutory elements of felony murder and aggravated battery, this Court concluded that aggravated battery was not a lesser included offense of felony murder because "[i]t is possible to commit each of these crimes without committing the other, and each contains elements which the other does not." Id. The Court then explained,
Even so, we do not believe it proper to convict a person for aggravated battery and simultaneously for homicide as a result of one shotgun blast. In this limited context the felonious conduct merged into one criminal act. We do not believe that the legislature intended dual convictions for both homicide and the lethal act that caused the homicide without causing additional injury to another person or property.
Id. (emphasis supplied). Based on this reasoning, this Court vacated Mills' aggravated battery conviction. See id.
However, as succinctly stated by this Court in Lukehart v. State, 776 So.2d 906 (Fla.2000), the issue resolved in Mills was whether convictions of both first-degree murder and aggravated battery could both stand when arising out of the same act. See id. at 923. The present case does not involve the imposition of multiple convictions and punishments for the same act. Thus, in my view, Mills has no application to the instant factual scenario, where Brooks was not separately charged with and convicted of felony murder and aggravated child abuse, but where aggravated child abuse simply formed the basis of the alternative felony murder charge and was applied as an aggravating circumstance in sentencing.[25] Instead, this case requires this Court to determine whether the felony *219 murder doctrine can be invoked when the same act of violence constitutes the act of aggravated child abuse and also results in the death of the child. This is a different question than that presented in Mills, and one, I suggest, the majority misapprehends.
Prior to 1984, the felony murder rule was triggered in Florida when a homicide was committed during the perpetration of certain enumerated acts that were separate and independent from the unlawful killing itself. For example, the felony murder statute provided that first-degree murder occurred when a person committed a homicide during the perpetration of crimes such as arson, sexual battery, robbery, burglary, and kidnapping. See § 782.04(1)(a)2., Fla. Stat. (1983). Florida's felony murder statute did not include the felonies of aggravated assault or aggravated batteryacts which accompany most any homicide. This distinction set Florida law apart from that in other states, such as New York, where courts applied the merger doctrine to reign in broadly worded felony murder statutes that included all felonies, even aggravated assault and battery, and thereby transformed every homicide into first-degree murder. See Robles v. State, 188 So.2d 789, 792 (Fla.1966).
In 1984, the Florida Legislature amended the felony murder statute to specifically include "aggravated child abuse" among the felonies that would invoke the felony murder rule. See 782.04(1)(a)2. h., Fla. Stat. (Supp.1984). As noted by the majority, "aggravated child abuse" was defined, in part, as the commission of an aggravated battery on a child.[26] The plain text of the statute then, as now, affords no indication that the Legislature intended to exclude application of the felony murder doctrine in those instances of aggravated battery on a child that involve a solitary stab wound, a lone blow to the head, one gunshot wound, or any other single act of violence. See Holly v. Auld, 450 So.2d 217, 219 (Fla.1984) ("[W]hen the language of the statute is clear and unambiguous and conveys a clear and definite meaning,. . . the statute must be given its plain and obvious meaning."). Thus, in my view, the felony murder statute clearly captures all instances of aggravated child abuse, regardless of whether a single violent act constitutes the abuse and simultaneously causes the child's death in this context. In these circumstances the statutes and the law do not limit the State to only premeditation.
The plain statutory language reflects a policy decision to protect the children of this state by subjecting those whose acts of child abuse produce death to the highest possible penalty.[27] The Legislature has *220 made the same determination with regard to other classes of our most vulnerable citizensthe elderly and persons with disabilities.[28] Application of Mills to the facts presently before the Court would graft limitations based on the nature of the crime in contravention of the plain text of the felony murder statute. See Mapps v. State, 520 So.2d 92, 93 (Fla. 4th DCA 1988) ("It is obvious that our legislature did not intend that the felonies specified in the felony-murder statute merge with the homicide to prevent conviction of the more serious charge of first-degree murder.").
At the time of our decision in Mills, as well as currently, aggravated battery of an adult cannot serve as the basis for a felony murder conviction or be applied as an aggravating factor during the course of a sentencing determination. Application of the felony murder rule in cases where a homicide is committed during the course of an aggravated battery of an adult may, indeed, present constitutional concerns that would justify imposition of the merger doctrine to void the felony murder conviction. By law, however, aggravated battery of a child can serve as the basis for a felony murder conviction, and can support application of the murder in the course of a felony aggravator in sentencing, regardless of whether a single act of violence constituted both the abuse and resulted in the death of the child. Nothing in Mills, other existing jurisprudence, or the felony murder statute itself compels or permits an alternative conclusion.
In my view, there is no question that Brooks engaged in aggravated child abuse when he inflicted a single, lethal stab wound on Alexis Stuart. Save the interpretive gloss applied to the felony murder statute by the majority, this act of aggravated child abuse can serve as a basis for the murder convictions under the felony murder rule and support application of the murder in commission of a felony aggravating circumstance in sentencing. This Court should not proceed to effectively amend or invalidate the felony murder statute by holding that aggravated child abuse is unavailable as a basis for felony murder in the absence of multiple acts of abuse. It certainly should not do so under the auspices of inapplicable judicial precedent. The reasoning undertaken by the majority in this regard is fatally flawed. For these reasons, I respectfully dissent from the portion of the majority opinion that voids felony murder as a potential theory underlying Brooks' convictions and invalidates the use of aggravated child abuse pursuant to the Florida Statutes as a statutory aggravating circumstance.
WELLS and BELL, JJ., concur.
PARIENTE, C.J., dissenting from denial of rehearing.
Although I dissented in part from the majority opinion and would have reversed Brooks' convictions because of the admission of the life insurance policy, I concurred in the majority's determination that *221 the aggravated child abuse merged into the felony murder and therefore did not support a separate aggravating circumstance. Having reached that conclusion, I must now concur with Justice Lewis that Brooks' convictions should be reversed and the case remanded for a new trial. Under the United States Supreme Court decision in Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), and this Court's decision in Fitzpatrick v. State, 859 So.2d 486 (Fla.2003), reversal is required because the general verdict of guilt precludes us from determining whether the jury relied upon the valid premeditated murder theory or the legally invalid felony murder theory.
ANSTEAD, J., concurs.
LEWIS, J., dissenting.
Although I continue to disagree with the original majority's holding that aggravated child abuse was not available as a matter of law for consideration as the felony underlying a felony murder theory of guilt because at all times it has been undisputed that only one lethal stabbing blow was inflicted to the infant's body for the reasons I set forth in my separate opinion in this case, see Brooks v. State, 30 Fla. L. Weekly S481, S493 (Fla. June 23, 2005) (Lewis, J., concurring in part and dissenting in part), in my view, the Court majority having reached the conclusion that no underlying felony existed as a matter of law, we must grant Brooks's motion for rehearing, reverse his convictions, and remand this case for a new trial. The majority's decision has been based upon the theory of merger because it would be unconstitutional and illegal to predicate two convictions on the single act. As more fully explained below, pursuant to our previous opinion in Fitzpatrick v. State, 859 So.2d 486 (Fla.2003), which was required by the United States Supreme Court's decision in Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), the majority's conclusion that a single stabbing blow cannot constitutionally, as a matter of law, constitute an underlying felony for the purpose of application of the felony murder doctrine requires this Court to reverse Brooks's convictions. See also Mackerley v. State, 777 So.2d 969 (Fla.2001) (holding that it is reversible error to sustain a conviction based on a general jury verdict for first degree-murder on dual theories of premeditation and felony murder where the felony underlying the felony murder charge is based on a legally unsupportable theory even when there is evidence to support premeditation); Valentine v. State, 688 So.2d 313 (Fla.1996) (holding that a conviction for attempted first-degree murder must be reversed where the jury was instructed on dual theories of attempted first-degree premeditated murder and attempted first-degree felony murder when this Court later determined that attempted first-degree felony murder does not exist in Florida).
In Fitzpatrick, the trial judge instructed the jury with regard to both premeditated murder and felony murder with robbery and burglary as the underlying felonies. See id. at 490. The jury returned a nonspecific general verdict finding Fitzpatrick guilty of first-degree murder. See id. On appeal, Fitzpatrick asserted that reversal was required because the jury may have relied upon an erroneous and illegal definition of the underlying felony of burglary as the basis for a felony murder conviction. See id. In our opinion, we noted that the jury was instructed with regard to the statutory definition of burglary at the time but that definition did not accommodate the limitation on burglary as announced by this Court in Delgado v. State, 776 So.2d 233 (Fla.2000). Based on this conclusion, the Court, upon application of the United *222 States Supreme Court's decision in Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), reversed Fitzpatrick's conviction, holding "that a general jury verdict cannot stand where one of the theories of prosecution is legally inadequate." Fitzpatrick, 859 So.2d at 490. We noted that we were compelled to reverse Fitzpatrick's conviction because a general jury verdict based on multiple theories of prosecution, one of which is felony murder based on an underlying felony later determined to be legally insufficient, cannot be upheld due to the fact that it is impossible to "discern whether the jury convicted Fitzpatrick based on the legally sufficient grounds . . ., or the inadequate charge of felony murder based on burglary." Id. at 491.
In my view, our decision in Fitzpatrick and that in Yates are directly applicable in the instant matter and require the reversal of Brooks's convictions. Initially, it is clear that the jury here, as in Fitzpatrick, was instructed by the trial court on dual theories of guiltpremeditated first-degree murder and also first-degree felony murder. Additionally, as was the verdict in Fitzpatrick, the jury in the instant matter entered only a general verdict finding Brooks guilty of first-degree murder after being instructed on both theories. Moreover, similar to our holding in Fitzpatrick that the crime of burglary could not legally serve as the felony underlying the felony murder charge, the original majority in this case has determined that the jury was erroneously instructed that the aggravated child abuse charge could serve as the underlying felony in a felony murder theory of guilt because the undisputed single stabbing blow alleged to support the charge of aggravated child abuse does not exist as a matter of law on these undisputed facts and would be unconstitutional and illegal, thereby barring the existence of aggravated child abuse as the underlying felony.[1]See Brooks, 30 Fla. L. Weekly at S485-86. Given the general jury verdict entered in the instant matter, similar to the situation the Court faced in Fitzpatrick, it is impossible to discern whether the jury here convicted him on the legally sufficient basis of premeditated murder or the legally invalid charge of felony murder based on an invalid underlying aggravated child abuse felony which the original majority in this case determined did not and could not constitutionally exist as a matter of law. Based on the foregoing, in my view, it is clear that this Court's decision in Fitzpatrick, which applied the United States Supreme Court's holding in Yates that a general jury verdict is invalid when it rests on multiple theories of liability, one of which is legally inadequate, see Yates, 354 U.S. at 312-13, requires that the conviction here be overturned and his case remanded with instructions for a new trial to be conducted. The failure to do so is in direct conflict with Yates and refuses to follow its clear mandate.
The State attempts to transform the original majority's decision in the instant matter into a factual dispute and argues that the majority merely established that there was a simple failure of proof in the State's case and that cases involving factual or evidentiary insufficiency are governed by the United States Supreme Court's opinion in Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), not by Yates which, the State contends, *223 only applies to legal insufficiencies. A full reading of the High Court's opinion in Griffin in proper context reveals that the State incorrectly contends that Griffin has application here. In Griffin, the defendant was charged with and found guilty by general verdict of unlawful conspiracy with two alternative objects: "(1) impairing the efforts of the Internal Revenue Service (IRS) to ascertain income taxes; and (2) impairing the efforts of the Drug Enforcement Administration (DEA) to ascertain forfeitable assets." 502 U.S. at 47. The defendant appealed, asserting that the decision in Yates required reversal because "the general verdict could not stand because it left in doubt whether the jury had convicted her of conspiring to defraud the IRS, for which there was sufficient proof, or of conspiring to defraud the DEA, for which (as the Government concedes) there was not." Id. at 48. The High Court rejected the defendant's argument, distinguishing the facts of Yates, and held that it was unwilling to extend Yates to the facts of Griffin to "set aside a general verdict because one of the possible bases of conviction was neither unconstitutional ..., nor even illegal . . ., but merely unsupported by sufficient evidence." Id. at 56 (emphasis supplied). Isolated sentences taken out of proper context cannot alter the fundamental difference.
In my view, the issue now presented in the instant matter is entirely distinct from the issue addressed in Griffin and, therefore, the outcome of the present case is not controlled by that decision. In Griffin, the High Court was assessing whether it was error to allow a theory of responsibility to be submitted to the jury when there was only insufficient evidence to support one theory of responsibility, whereas the issue presented here, as directly presented in Yates, involves a legally invalid theory of responsibility being submitted to the jury due to the underlying felony presented as the only basis for the felony murder charge being nonexistent as a matter of law under the undisputed factscreating a legal bar to a felony murder conviction or a nonexistent underlying felony as a matter of law. As we made clear in Fitzpatrick, in cases such as this, the uncertainty is created because it is impossible to discern whether the jury in the instant matter convicted Brooks of the legally valid charge of premeditated murder, or the legally invalid charge of felony murder based on aggravated child abuse as the underlying felony that requires the reversal of Brooks's conviction. See Fitzpatrick, 859 So.2d at 491; see also Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). The U.S. Supreme Court in Griffin even recognized this clear distinction and provided further explanation:
That surely establishes a clear line that will separate Turner from Yates, and it happens to be a line that makes good sense. Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to lawwhether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence, see Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).
Griffin, 502 U.S. at 59-60.
In a similar manner, our decision in San Martin v. State, 717 So.2d 462 (Fla.1998), *224 is also clearly inapposite. First, the defendant in San Martin asserted that in the capital punishment context a general verdict form is itself unconstitutional which is not the issue here. Secondly, in San Martin, the defendant asserted that because the evidence was insufficient to support premeditation, it was reversible error for the trial court to instruct the jury on both premeditated and felony murder. See id. at 469. Although we agreed with San Martin that there was insufficient evidence to support premeditation, we held that any error was harmless because the evidence clearly supported a conviction for felony murder. See id. Relying on the decision in Griffin, we affirmed the defendant's conviction for first-degree murder, noting that "reversal is not warranted where the general verdict could have rested upon a theory of liability without adequate evidentiary support when there was an alternative theory of guilt for which the evidence was sufficient." See San Martin, 717 So.2d at 470 (emphasis supplied). However, unlike the circumstance presented in San Martin, the issue presented here is whether a general verdict can stand when it may have rested on a legally invalid or unavailable theory of guiltwe have undoubtedly held that it cannot. In San Martin, we specifically recognized that "a general guilty verdict must be set aside where the conviction may have rested on a... legally inadequate theory." Id. Therefore, because the issue in San Martin clearly addressed a factually unsupported theory being submitted to the jury, whereas the issue in the instant matter addresses the issue of a legally invalid theory of liability being submitted to the jury, our decision in San Martin is also of no application in consideration of this motion for rehearing.
Based on the above analysis and distinction, in my view, it is clear that the majority, by denying the motion for rehearing, has affirmed an unconstitutional imposition of the death penalty contrary to both applicable Florida and United States Supreme Court authority. The majority's denial of Brooks's motion for rehearing has rendered him without the means or a forum in which he can obtain relief except federal intervention to prevent the unconstitutional imposition of the death penalty. Accordingly, I dissent.
NOTES
[1] The trial court refused to consider that Stuart was less than twelve years of age in aggravation, finding that consideration of that factor would constitute improper doubling with the aggravating factor of murder in the course of a felony predicated on aggravated child abuse. If an aggravated child abuse felony aggravating factor were not available, the factor of victim less than twelve years of age would be appropriate.
[2] These factors included: Brooks' lack of significant criminal history (little weight); age of twenty-three at the time of the offense (little weight); strong family ties and participation in community affairs (very little weight); status as his family's only living son (some weight); military service (little weight); good character and ability to establish loving relationships (little weight); status as the father of a six-year-old child (some weight); courtroom behavior and demeanor (some weight); regular church attendance and Christian training (little weight); and employment history (little weight). The trial court also considered Davis's sentence of life in prison (little weight); the sufficiency of life in prison without parole as punishment (little weight); and the sufficiency of life in prison without parole as protection for society (some weight).
[3] As discussed in greater detail within, Gilliam's reports about the failed murder attempts are corroborated by the testimony of several law enforcement officers and government records.
[4] The trial court's limitation on the use of the insurance policy to establish the source of funding, but not Brooks' motive, is internally inconsistent because it draws an artificial distinction between these convergent concepts. However, the trial court's caution and limitation is certainly understandable with reference to some of the general language in Brooks I.
[5] The nexus requirement articulated in Stoudemire and Givens apparently supersedes other cases from the State of Georgia cited by the partially dissenting opinion of Chief Justice Pariente for the proposition that the prosecution must show that the defendant knew of an insurance policy prior to its introduction into evidence. See concurring in part and dissenting in part op. of Pariente, C.J., at 5, 7 (citing Hutchins v. State, 171 Ga.App. 309, 319 S.E.2d 130 (1984); Whittington v. State, 252 Ga. 168, 313 S.E.2d 73 (1984)).
[6] Indeed, the relevance and highly probative nature of the policy to Brooks' motive is born out by the scenario that would have likely emerged in its absence. Under such circumstances, the defense would have certainly impeached Gilliam's testimony with regard to the $10,000 Davis promised to pay Brooks with evidence of Davis's modest means.
[7] These statements included those of a car salesman who testified that Davis inquired about a $32,000 automobile and stated that he was coming into some money, and Anthony Sievers, a friend who testified that Davis told him about procuring a new car with "no payments involved." See Brooks I, 787 So.2d at 772.
[8] In the initial trial, Brooks challenged the admissibility of the hearsay testimony of Steve Mantheny regarding statements made by Davis in obtaining the insurance policy. See Brooks I, 787 So.2d at 772. We noted that Brooks had objected at trial to both Mantheny's testimony and introduction of the actual life insurance policy. See id. Our holding with respect to the admissibility of the challenged evidence, however, focused solely on Davis's hearsay statements, and did not expressly address the insurance policy. See Brooks I, 787 So.2d at 773 & n. 4 (holding that "the trial court abused its discretion in admitting Davis's numerous statements to Samms, Johnson, Sievers, and Mantheny, and Brooks was substantially prejudiced as a result") (emphasis supplied). There is no indication that this Court treated the insurance policy, itself, as a hearsay statement, or in any way held that the insurance policy itself was not admissible.
[9] According to the testimony of an officer from the Crestview Police Department, Thomas's apartment is located 0.38 miles from where Carlson's car with the bodies was found.
[10] The presence of Brooks in the apartment was corroborated by the DNA found on a cigarette butt recovered from Thomas's ashtray which matched Brooks' DNA.
[11] Trial testimony established that the credit union is located 0.65 miles from Thomas's apartment.
[12] Bank records show that Rushing did indeed make a withdrawal from her account at 9:53 p.m. on the night of the murders.
[13] This evidence included nondescript contact blood stains found on the exterior of the vehicle on the driver's-side front and rear doors; contact blood stains on the interior rear driver's-side door that were consistent with someone with blood on their hands attempting to exit the vehicle; contact stains on the driver's headrest consistent with placement of a bloody hand; and medium-velocity blood spatter and arterial spurting on the front passenger's door panel. Based on this evidence, the crime scene analyst concluded that Carlson was behind the steering wheel when the attack began, that the attack continued as she moved to the front passenger's side of the vehicle, and that her attacker was seated in the driver's-side back seat. Another forensic expert concurred with this conclusion.
[14] The crime scene and forensic experts concluded that the blood spatter pattern on the inside of the front passenger door precluded the possibility of someone occupying that seat at the time the stabbing occurred.
[15] The trial court refused to consider that Stuart was less than twelve years of age in aggravation, finding that consideration of that factor would constitute improper doubling with the factor of murder in the course of a felony predicated on aggravated child abuse.
[16] Davis's dog was named "Heavy."
[17] We reject, however, the State's contention that Brooks' statements also formed an inseparable part of the crime charged and were necessary to explain the entire context of the criminal episode. The case law cited by the State is distinguishable from the instant case because the testimony regarding Brooks' statements could have been easily excised from the explanation of the two attempts on Carlson's life. See Zack, 753 So.2d at 17 (concluding that evidence of earlier crimes is admissible where it casts light on perpetrator's motive, intent, and timing of the crime charged); Coolen v. State, 696 So.2d 738, 742-43 (Fla.1997).
[18] The other examples of demonstrable prejudice cited by Brooks are meritless and will not be discussed in detail herein. According to Brooks, prejudice meriting a change of venue was evident in (i) the existence of a large number of for-cause challenges to which the State did not object; (ii) defense counsel's renewal of the motion for change of venue during voir dire; (iii) the size of the community where the crimes took place; (iv) the notoriety resulting from a black male being accused of killing a white woman and her baby; and (v) the weakness of the State's case. Factors (ii) and (v) are notably self-serving and unsuitable for making a venue change determination. Factor (i) is equally unsuitable for judging when a change in venue is warranted because of the wide range of reasons for-cause challenges are made. Factors (iii) and (iv) are premised on the notion that the facts of the case would inflame public opinion. However, in the instant case, six years passed between the crimes and Brooks' second trial. Therefore, any impact an inflammatory factual scenario may have had would have been substantially mitigated.
[19] A forensic expert testified that Stuart's wounds were consistent with the perpetrator stabbing her in the heart and then returning to inflict other stab wounds.
[20] Gilliam was convicted of perjury for giving conflicting testimony in previous proceedings in this case.
[21] I regret that we did not provide clearer guidance regarding this issue on retrial. However, it stands to reason that our holding that evidence of Davis's desire to purchase the life insurance policy was not relevant to prove Brooks' motive or intent absent proof that Brooks possessed knowledge of the policy would extend to evidence of the life insurance policy itself.
[22] From the cold transcript, this comment can be read to suggest that Brooks told detectives that Davis informed him of the policy, which would be contrary, to the detectives' testimony. Defense counsel did not object to this remark, suggesting it was delivered in such a manner as to indicate that Brooks said Davis told him only that he was not the father of Carlson's infant daughter.
[23] Brooks' counsel objected to the prosecutor's references to the policy in closing argument and moved for mistrial on grounds that the argument highlighted evidence that tended to prove Davis's motive but not that of Brooks. The objection was overruled and the motion for mistrial denied.
[24] Aggravated battery was not then, and is not now, an enumerated felony under the felony murder statute. See § 782.04(1)(a)2., Fla. Stat. (2004).
[25] Indeed, the merger of charges and convictions contemplated by this Court's decision in Mills would be impossible in the instant case where there are not two charges or convictions to merge.
[26] The statute in effect in 1984 provided:

"Aggravated child abuse" is defined as one or more acts committed by a person who:
(a) Commits aggravated battery on a child;
(b) Willfully tortures a child;
(c) Maliciously punishes a child; or (d) Willfully and unlawfully cages a child.
§827.03(1)(a)-(d), Fla. Stat. (Supp.1984).
The current statute provides:
"Aggravated child abuse" occurs when a person:
(a) Commits aggravated battery on a child;
(b) Willfully tortures, maliciously punishes, or willfully and unlawfully cages a child; or
(c) Knowingly or willfully abuses a child and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to the child.
§ 827.03(2)(a)-(c), Fla. Stat. (2004).
[27] Although extrinsic aids need not be invoked to divine legislative intent where the statutory text is plain and clear, see Holly, 450 So.2d at 219, the legislative history of the 1984 amendment incorporating aggravated child abuse to the felony murder statute further demonstrates the divergence between the majority's opinion and the Legislature's intent. According to the staff summary and analysis at the time the statute was amended, aggravated child abuse was added to the statute to remedy the then-current situation in which, "If a child is killed as a result of aggravated child abuse, and no premeditation is proved, under the present murder statute, the maximum murder charge would be second or third degree murder." Fla. H.R. Comm. on Judiciary-Crim., HB 135 (1983) Staff Analysis 1-2 (final June 13, 1984) (on file with Fla. State Archives).
[28] Aggravated abuse of an elderly person or disabled adult can also serve as the felony underlying felony murder and as an aggravating circumstance during sentencing. See §§ 782.04(1)(a)2. i., 921.141(5)(d), Fla. Stat. (2004).
[1] It must be clear that the issue presented by Brooks in his motion for rehearing does not involve a disputed issue of fact. The fact that Alexis Stuart suffered only a single stabbing blow was never in dispute at any time. During the trial, neither party contended that multiple wounds were inflicted upon Alexis Stuart. Therefore, the issue presented in this motion for rehearing is strictly an issue of law.